[Crim. No. 915.   Fourth Dist.   July 30, 1952.]

THE PEOPLE, Respondent, v. LAWRENCE JAMES WALKER, Appellant.

Crispus A. Wright and John W. Preston for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged in Count I with the murder of Richard Cook; in Count II with the murder of Doris Cook; in Count III with the kidnaping of Doris Cook; in Count IV with assault with intent to commit rape on Doris Cook; in Count V with assault with a deadly weapon upon James Hicks; in Count VI with the kidnaping of Betty Maund; and in Count VII with the rape of Betty Maund. It was also alleged, as to each count, that he was armed with a pistol, being the same one in each instance, and that each was a different offense of the same class as each of the others, and connected in its commission with each of the others.

A motion for a change of venue was denied. A jury found the defendant guilty on the first four counts, recommending life imprisonment on the murder charges, and failed to agree on the other three counts. He has appealed from the judgment and the order denying his motion for a new trial.

The general facts brought out in evidence will be briefly stated. About midnight on February 23, 1951, James Hicks and Betty Maund drove to a park in Riverside County, where they parked. Shortly thereafter, the appellant appeared with a pistol in his hand. He struck Hicks on the head with the gun, knocking him down, and causing the gun to discharge. He then dragged Betty Maund into his car and drove to another place where he raped her. The next morning the officers found an expended .45 calibre pistol shell at the place where Hicks had been attacked.

The scene of the crimes charged in the first four counts is in a hilly section southerly from Riverside and westerly from March Field, through which several narrow crooked roads run. South of March Field, Cajalco Road runs westerly from Highway 395. A few miles westerly from Highway 395 a small road runs northerly from Cajalco Road, leading to Arlington, and a few miles farther west another road runs northerly leading to Riverside via Lake Mathews.

About 11:03 a. m. on March 26, 1951, a Mr. and Mrs. Arthur drove westerly on Cajalco Road and turned northerly on the road to Arlington. After proceeding a quarter of a mile they saw a tan colored car parked across the road, with the hood up and the appellant standing there. He tried to stop them but Arthur passed on the shoulder and went on. About 11:20 a. m. a green Ford, in which Mr. and Mrs. Cook and their baby had been traveling, was found on the north side of Cajalco Road between the Arlington road and the road to Lake Mathews. The body of Richard Cook, still warm, was on the ground and the baby was on a blanket at the side of the car. The left rear fender of the Ford had a brown smear on it, its left running board had been scraped its full length, and its front fender was damaged with the fender brace broken loose. A part of a broken bolt, with the nut on it, was found near by. Marks on the ground showed that another car had turned around in front of the Ford, which was faced west, and had then proceeded in an easterly direction.

The autopsy surgeon testified that the death of Richard Cook was caused by a bullet which had gone through his body, piercing the heart; that the entrance wound was 5/16 inch in diameter; that an opening that size would admit a missile 45/100 inch in diameter because the skin was elastic and would contract; that the exit wound was larger, with a margin of bruises and tears around it; and that death would occur within three or four minutes.

About 4 p. m. on March 26th some officers found a tan Oldsmobile parked in a service station and repair lot in Riverside. Its right front fender and bumper were damaged, with the bumper torn loose and hanging out of place. There was a broken bolt in the bumper which fitted the other part found at the scene of the crime, and it had spots of green paint smeared on it. In the trunk of the car they found a .45 calibre pistol in a bag of clothing.

The officers, with an M.P. from March Field, went to a nearby cafe where they saw the appellant facing the front window. The M.P. went in and told the appellant the officers wanted to talk to him. The appellant went out the back door, but an officer drew a gun and stopped him as he was running away. He was taken back to the service station where he admitted that the Oldsmobile and the pistol belonged to him, and that he had left the car there to be repaired. When asked about the damage to the car he said

it had been in an accident in Hollywood a few days before. About that time, and later that night, the appellant denied that he had been in the Cajalco area on that day, saying that he had been in Riverside until about noon, when he returned to the Base and later returned to Riverside. When told that a bolt had been picked up on Cajalco Road at the scene of a collision where the body of a man was found, which fitted the broken one on his bumper, he replied that he had not been in that area on that day.

The appellant was in the Air Force and stationed at March Field. On the afternoon of March 27th, he told the officers that he had left March Field at about 10 a. m. on March 26th; that he went down Highway 395 and turned to the west on Cajalco Road; that he collided with a Ford as he came around a curve; that he did not stop; that in his mirror he saw a young man alight from the Ford and stand in the road; and that he continued on westerly, going on to Riverside and then back to the Base, arriving there about noon. When asked why he had run at the time of his arrest he said he did not like policemen.

On the morning of March 28th, the body of Doris Cook, with blood on her green sweater and other clothing, was found in a gully 3/10 of a mile south of Cajalco Road and about 11 miles east of the place where Richard's body was found. There were multiple scratches and bruises on her body. The autopsy surgeon testified that her death was caused by a bullet wound; that the entrance and exit wounds measured 3/8 of an inch in diameter without stretching the skin; that she might have survived up to a half an hour; and that the condition of her body was consistent with her death about the middle of March 26th. He expressed the opinion that the bullet causing the missile tract through her body was slightly less than $\frac{1}{2}$ inch in diameter, and that she was lying on her face when the wound was inflicted. The surface of the ground near the body had been disturbed, and there were signs that she had crawled or been moved some distance. About 226 feet away a .45 calibre shell was found, and 8 feet from it a bullet with its point slightly imbedded in the ground. Tire tracks were found 69 feet from the body, which matched the markings left by the tires of the appellant's car.

A special agent of the FBI, specializing in the examination of firearms, testified that he had examined the shell found at the scene where Hicks had been hit over the head

with a gun and the shell found near Doris Cook's body, examining them in connection with the pistol found in appellant's car. They were both .45 calibre and identical in all respects to the cartridges found in appellant's gun. Basing his opinion on a comparison of the microscopic markings found on these two shells with the markings from a cartridge which he fired from appellant's pistol, which were identical in all respects, he expressed the opinion that they had been fired from the appellant's gun to the exclusion of all other weapons. He also compared markings on the bullet found near Doris Cook's body with those on a bullet fired from the appellant's gun, and identified it as having been fired from appellant's pistol.

Another special agent of the FBI, a chemist specializing in hair and fiber examinations, made a microscopic examination of fibers which he removed from Doris Cook's green sweater and compared them with a green fiber found in the appellant's car. They were found to be similar in all observable characteristics and could have been from the same source. He also made a microscopic examination of a long hair found in appellant's car and compared it with a hair removed from Doris Cook's head. The hairs were similar in all respects and could have been from the same person.

The distance between the place where the body of Richard Cook was found and the main gate of March Field, going by the place where his wife's body was found and thence along Cajalco Road and Highway 395, was 17.9 miles and took 28 minutes to cover at 45 miles per hour. The distance between the same two points, going past Lake Mathews and along Victoria Avenue into Riverside, and thence out Highway 395 along the route the appellant said he traveled, was 23.9 miles and took 32 minutes at the same speed. A witness testified that about 1 p. m. on March 26th he was driving north toward Riverside on Victoria Avenue; that he saw a brown Oldsmobile car proceeding ahead of him at 45 or 50 miles an hour; that he followed close behind this car for three or four miles and when he turned off it was still going north on Victoria; and that the right front fender of the brown car was damaged and the front bumper was sticking out ahead of the car. The following day he identified the appellant's car as the one he had seen on Victoria the day before.

The appellant testified that on the night of February 23d, he had been out with a girl; that he took her home around

11; that he then went to an eating place where he met some people with whom he went to a night club in San Bernardino; and that he stayed there until 2 a. m.

He testified that on March 26th, he left March Field after 10, went down Highway 395, and turned west on Cajalco Road; that he turned off on Arlington Road but soon decided it did not lead to Lake Mathews; that he tried to turn his car but it stalled; that he lifted the hood and straightened some wires; that he saw a car coming from Cajalco Road, put up his hand for the car to stop but the driver did not stop; that he waited about five minutes and went back to Cajalco Road and turned west on that road; that he tried to pass a green car and collided with it; that he did not stop because he had recently gotten a ticket for driving without a license; that he looked in his mirror and saw a young man get out of the car; that he kept on driving and turned right on the road to Lake Mathews; that after he passed the lake he drove along Victoria Avenue into Riverside, and then over to and down Highway 395 to March Field, arriving there about 12 o'clock; that he got his lunch and did several things at the Base, leaving there sometime after 12:30; that he drove up Highway 395 to Riverside and left his car at this garage to get the bumper fixed; that he went to a court and paid a fine for driving without a license; that a little later he and a friend went back to the garage and then to the cafe where he was arrested; that when he saw the officers he went out the back door because he had been in an accident without stopping, and thought if he got to the Base he would be under military law; that he walked but did not run; and that he told the officers the car and the gun belonged to him. He denied that he had committed any of the crimes with which he was charged.

The appellant produced an expert witness, who is a surgeon with experience in removing projectiles from bodies. In response to hypothetical questions he expressed the opinion that the bullets causing the death of Richard and Doris Cook had been of a medium calibre, larger than a .22 and smaller than a .45.

It is first contended that the evidence is insufficient to support the judgment. It is argued that the testimony of the ballistic expert is not conclusive; that certain facts are consistent with his innocence, including his failure to show any nervousness, his leaving his car and pistol where they could easily be found; that no motive appears since he

did not know the victims; and that it was impossible for him to have committed these crimes since he appeared at March Field about 11:40 a. m. and Richard Cook must have been murdered after 11:10 a. m.

These arguments rest on conflicting evidence or inferences and are not controlling. The evidence as to the time element is far from sufficient to show that the appellant could not have committed these crimes. The appellant testified that he arrived at March Field "approximately about a quarter to twelve, or close to 12." Three soldiers testified they saw him approaching the main gate from the direction of Riverside. One said "It was around quarter to twelve to twelve o'clock." Another said "Between 15 to 12:00 and 12:00 o'clock." The other said "approximately twenty minutes to twelve," but his explanation as to how he fixed the time clearly showed that it was much later. None of these witnesses had a watch, and it is significant that none of them saw the damaged condition of appellant's car, which was so obvious to others. No impossibility appears even if these witnesses were to be believed.

That these witnesses may have been mistaken as to the day on which they saw the appellant thus approaching the entrance to March Field about 12 o'clock is indicated by their failure to see the damage to his car, and by other evidence. There is strong evidence that his damaged car was seen about 1 p. m. coming from this general area and proceeding along Victoria toward Riverside. The appellant admits that he followed that course into Riverside after colliding with the Cook car. The evidence fails to sustain the contention that it was impossible for the appellant to have committed these crimes.

A motive clearly appears, and there is strong evidence that appellant's gun was used, and the evidence indicates that Doris Cook had been in his car. He tried to stop a car in which a woman was riding, on a lonely road, a few minutes before the first of these crimes was committed. He admits that he was at the scene of that crime, and involved in an incident which appears to have been closely connected with it, within a very few minutes of the time it was committed. He tried to run away when told the officers wanted to talk to him, and he repeatedly denied that he had been in the area involved until that fact was thoroughly established. It cannot be held that the evidence is insufficient to support the judgment.

■ It is next contended that the court erred in denying a motion for a change of of venue. Appellant's affidavit in support of the motion alleged, on information and belief, that he could not have a fair trial in that county because of the great newspaper publicity given to alleged details concerning the crimes charged; that public sentiment and feeling had been aroused against him; and that the sheriff's office had inspired this adverse sentiment against him by giving alleged facts to the press. It stated that he believed the people of the county were prejudiced against him because the circumstances surrounding these crimes would naturally induce excitement, and all of the purported victims were members of the Caucasian race; that the people of the county generally believed he was guilty of some or all of the offenses charged; that the sheriff's office believed he was guilty and the deputy sheriffs would not believe his denial of guilt; that statements damaging to him had been furnished to the press by the officers, which he had no opportunity to refute; that prejudicial matter had been published by the press of Southern California; and that such prejudicial influences had been brought to bear on the general public in the county to an extent which made a fair trial impossible. Newspaper articles were attached, the last of which was published nearly three months before the trial.

Five affidavits were filed in opposition to the motion. These support the ruling made, and it would serve no useful purpose to summarize them. The court's conclusion is also supported by the proceedings in the empanelment of the jury. Prior to the trial, the appellant's challenge to the entire regular jury panel was sustained. His counsel agreed that a special venire of 80 persons should be summoned by an elisor, appointed without objection, and that the elisor should summon further persons if that became necessary. Of the 80 persons thus summoned the court excused 33 for valid reasons, seven because they were opposed to the death penalty. A further panel of 40 persons was later called. When the jury was completed, 10 of whom were on the original special panel, the appellant had used only 14 of his 20 peremptory challenges, and his counsel announced that he was satisfied with the jury as then constituted. No error or abuse of discretion appears in this connection. (*People* v. *Yeager*, 194 Cal. 452 [229 P. 40].)

It is next contended that the court erred in overruling a demurrer to the indictment on the ground that the last three

counts were improperly joined with the first four counts. It is argued that a joinder of the two sets of crimes was not permissible under section 954 of the Penal Code, since the offenses were neither of the same class nor connected together in their commission. It is further argued that the allegation in each count that the offenses were committed by the use of the same gun resulted in prejudice.

The charge of rape of Betty Maund and of assault with intent to commit rape of Doris Cook clearly belong to the same class of crimes, and the same is true of the charges of kidnaping the two women. Both rape and murder are forms of assault and both are offenses against the person.

Moreover, a joinder of distinct offenses is permissible if there is a common element of importance in their commission. (*People* v. *Scott*, 24 Cal.2d 774 [151 P.2d 517].) Such a common element here appears in that the appellant was armed with the same gun and the gun was used in each set of offenses. We think a further common element may properly be said to appear in that in each instance a woman was kidnaped and a common intent is clearly disclosed. It may be said here as was said in *People* v. *Thorn,* 138 Cal. App. 714 [33 P.2d 5], (approved in *People* v. *Duane,* 21 Cal.2d 71 [130 P.2d 123]) : ''The legislature, it seems to us, meant by the use of the words, 'the same class of crimes or offenses,' in such sections, offenses possessing common characteritics or attributes, and it would seem that the different offenses set out in the information here do have many attributes in common.'' As one of the common elements of substantial importance the allegation as to each count, that the appellant was armed with the same gun, was a proper allegation of a material fact and did not constitute prejudice of which the appellant is entitled to complain. We regard the principles set forth in *People* v. *Duane,* 21 Cal.2d 71 [130 P.2d 123], as applicable here, and no reversible error appears in this connection.

It is next contended that the court erred in failing to enter the verdict on one count first brought in by the jury, and in coercing the jury and denying a motion for a mistrial based on such coercion.

The jury retired at 12:30 p. m. on August 3, 1951. It returned at 5:35 p. m. and requested the reading of certain evidence, which was done. It returned at 10:32 p. m. and reported that it was unable to agree. The court refused to discharge the jury, saying the case had been a protracted one

and that he felt more time should be given in deliberation and discussion, in an attempt to reach a verdict. On August 4, at 4:40 p. m., the jury was called into court and the judge asked whether or not it believed further deliberation to be useless. The foreman replied that an agreement had seemed unlikely "until a few minutes ago," but that it was now thought that a ground of agreement had been reached. At 9:35 p. m. the jury reported that it had made no progress since it was last in court, and that it had stood 11 to one since early the previous afternoon. No statement was made as to how many favored conviction. The court then said:

"Well, I hesitate very much to require you to deliberate further, ladies and gentlemen. *I fear,* from the state of the case, and that situation which the foreman has described, *that there is apparently one person in your group who is perhaps unwilling freely and fairly to discuss the matter with the other jurors, as the Court instructed should be done.* I know that probably all of you, including the alternates, will consider me somewhat of a tyrant, and considerably unfair if I require deliberation further. But you should understand, and I know that you do, that this matter is of tremendous importance to all concerned, and I know I speak for all counsel in the case when I say that nobody wants to see this matter have to be retried.

"As you know, we have had 74 witnesses here in some 18 trial days. We have had 110 exhibits. There has been a lot for you to discuss.

"*I feel that the evidence is such that 12 reasonable minds should be able to agree, one way or the other, upon that evidence.* I hesitate very much to require you to deliberate further, but I do feel that you should retire for the night, and attack the problem anew tomorrow morning. If at that time I may be of any further assistance to you, I shall certainly be glad to do so.

"*I only want you to understand that I am not trying to be mean to you; I am only trying to see that some verdict in this case is reached.* I think both sides of the case are entitled to have a verdict if it is humanly possible to reach a verdict in this case.

"I would therefore ask you to retire for the night. I know you have had a long, hard day. I wouldn't require you to deliberate any further this evening. But tomorrow morning, it may be that something can be accomplished.

"I think, in view of the tremendous amount of time, energy and effort, and everything else that has gone into this case, that we should expend every effort to arrive at a solution. Therefore, I shall ask that you retire for the night, and we will get together again tomorrow and see if we can arrive at something." (Italics ours.)

The jury then retired and returned on August 5th, at 12:25 p. m., announcing that it had reached a verdict on one count. The court examined that verdict, and pointed out that no finding had been made upon one issue involved in that count. The foreman stated "We voted we couldn't agree on it." The court returned the verdict to the jury, stating that he thought they should deliberate further on that question, and that it would ask it to also deliberate further as to the other issues submitted to it. The jury again returned at 4:07 p. m. and reported that it had reached a verdict on four counts and that it felt that further deliberation on the remaining counts would be of no avail. Verdicts of guilty on the first four counts were entered, with separate verdicts finding that the appellant was armed in each instance. The jury was polled on the first verdict on the first count, and polling was waived on the other verdicts.

The appellant argues that the italicized portion of the judge's remarks placed the one juror under a pressure amounting to coercion and reversible error, citing *People* v. *Kindleberger*, 100 Cal. 367 [34 P. 852] ; *People* v. *Conboy*, 15 Cal. App. 97 [113 P. 703] ; *People* v. *Carder*, 31 Cal.App. 355 [160 P. 686] ; *People* v. *Blackwell*, 81 Cal.App. 417 [253 P. 964] ; *People* v. *Talkington*, 8 Cal.App.2d 75 [47 P.2d 368] ; *People* v. *Walker*, 93 Cal.App.2d 818 [209 P.2d 834] ; *People* v. *Crowley*, 101 Cal.App.2d 71 [224 P.2d 748]. The respondent relies on *People* v. *Miles*, 143 Cal. 636 [77 P. 666] ; *People* v. *Rhodes*, 17 Cal.App. 789 [121 P. 935] ; *People* v. *Piscitella*, 90 Cal.App. 528 [266 P. 349] ; *People* v. *Finkelstin*, 98 Cal. App.2d 545 [220 P.2d 934] ; *People* v. *Lammers*, 108 Cal. App.2d 279 [238 P.2d 667].

The distinction between such cases as *People* v. *Kindelberger*, where the remarks of the judge were such as to indicate his opinion on the question of guilt, and cases where the remarks made gave no intimation as to how the judge viewed the evidence, is pointed out in *People* v. *Miles*, 143 Cal. 636 [77 P. 666]. It was there said: "In the Kindelberger case this court held that the remarks of the trial judge indicated that he viewed the evidence as pointing to

defendant's guilt. No such inference can be drawn from the remarks of the court in the present case. No intimation whatever was given as to how the court regarded the evidence; its whole purpose was to require a reasonable effort on the part of the jury to come to some conclusion one way or another, and not cause a mistrial.''

When the remarks made, considered as a whole, constitute merely an explanation of the reasons for detaining a jury, the importance of the case, and the desirability for a careful and dispassionate discussion and consideration of all of the issues to the end that a verdict one way or the other should be reached, without in any way indicating that it should be a verdict of guilty, there is no coercion or reversible error. (*People* v. *Lammers,* 108 Cal.App.2d 279 [238 P.2d 667].)

Here, the way the jury stood was not revealed and there was no intimation as to which way the judge viewed the evidence. The trial had taken 18 days, there were many witnesses and many exhibits, and there were many separate issues calling for a large number of verdicts. The large number of issues and the mass of material naturally called for an unusual amount of analysis and consideration, the judge properly urged that sufficient time be taken to carefully consider the entire matter, and the time devoted to that purpose was not unduly excessive. His remarks clearly showed that he was explaining to the jurors why he detained them, and impressing upon them the importance of the case and the extent of the issues and evidence which would naturally require a free and fair discussion and deliberation. He suggested that ''perhaps'' one juror had been unwilling to discuss the matter freely and fairly, explained at some length why he felt that further deliberation was advisable, and suggested that they get a night's rest before beginning such further deliberation.

The jury had reported that it was unable to agree after only eight hours of deliberation. Nearly a day later it reported that a ground of agreement might have been reached. A few hours later, it reported no progress, at which time the remarks complained of were made. The jury reported some progress at noon the next day, and reached a verdict a full working day after the court's remarks were made. There is nothing to indicate that a verdict was finally reached because of coercion on the part of the court, rather than because of a full and free discussion and deliberation of the

problem, as urged by the court. It does not appear that one juror was coerced, or that he changed his vote from innocent to guilty. It would seem much more probable from the record that the one juror converted the other eleven from their former insistence on the death penalty. Assuming that one or two of the court's remarks had better been left unsaid, they were not sufficient under the circumstances to require or justify a reversal.

There is no merit in the contention that the court erred in refusing to enter the verdict on one count which was first brought in. It clearly appeared that the jury had not agreed on all elements of that one count. Appellant's further contention that the court erred in denying his motion for a new trial is based upon matters already covered and cannot be sustained.

The judgment and order are affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied August 8, 1952, and appellant's petition for a hearing by the Supreme Court was denied August 28, 1952. Carter, J., was of the opinion that the petition should be granted.