[Crim. No. 2355.　Third Dist.　Feb. 20, 1953.]

THE PEOPLE, Respondent, v. KARAM CHAND, Appellant.

Goldstein, Barceloux & Goldstein for Appellant.

Edmund G. Brown, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

VAN DYKE, P. J.—Appellant, Karam Chand, was convicted by a jury of the crime of second degree murder in the killing of Salomon Rios in Sutter County. He appeals from the judgment and from the order denying a new trial.

Chand is a Hindu who had married a Mexican woman by whom he had four children, the eldest being 17 years of age. He was living on a farm owned by himself and his wife and on this property he also conducted a store. He and his wife, because of marital difficulties, had separated, but both were living on the farm, Chand with the children in the farmhouse and Cirila, his wife, in a small detached dwelling. Cirila's sister Susie and her husband, the decedent Salomon Rios, were visiting her and had spent the afternoon there. About 7 o'clock in the evening they started to drive away. Their car became mired in the mud and they were unable to leave.

They asked one Harry Tabata, a Japanese employee of Chand, to help them and he went to look at the situation. While he, Salomon, Susie and Cirila were grouped about the car, Chand came walking toward them. He had been in the house a considerable time and on entering had early learned of the presence of Salomon and Susie on the property despite his having frequently told Salomon not to come there. He took no action, however, but ate dinner with his family, then retired to his living room when another employee, Jack Yokum, came in and told him that there was a car stuck outside. He put on his jacket in which there was a small flashlight and a loaded automatic pistol and walked outside through the yard and to the group around the car. From that point on the testimony as to what occurred is much in conflict. Susie testified that she saw Chand approach the group, heard him curse Salomon and declare his intention to kill him, saw him walk directly up to Salomon, shine the light in his eyes and, at point-blank range, fire two bullets into his chest. She said Salomon turned and ran and Chand pursued him, declaring his intention to "finish" him "now." Salomon disappeared in the darkness and Susie sought him, finding him close to Tabata's house some little distance from where his car was mired. She then phoned for an ambulance and returning to the scene heard Cirila talking to Chand, telling him to forget everything and call a doctor, and she heard Chand reply "Who care," whereupon he walked to the house. Susie said that later on she said to him, "You know what you do, Karam, you kill my husband" and he said "Who care, you got another husband around." The dying declaration of Salomon was admitted in evidence and his story of the shooting corresponded closely with that of Susie.

The defense did not deny that Chand killed Salomon, but sought to prove that the killing was justified. Chand testified that he merely left his house and went into the yard to see if he could help about the mired car; that he carried the flashlight in his hand, leaving the pistol in his pocket; that he reached the group around the car; that he walked directly toward Salomon, saying, "What are you doing here"; that Susie said something in Spanish he could not understand and then Salomon, saying, "I am going to fix you up now, Karam," grasped Chand's throat, stopping his breathing and causing blindness; that he tried to break Salomon's grasp, but could not, then reached for his gun and shot; that he

fired to save his own life, which he was in fear of losing; that Salomon did not release his hold after the first shot and that he, Chand, fired again; that he did not know if he had hit Salomon, but Salomon released his hold after the second shot was fired and went away; that as soon as he got his breath he, Chand, called for help and his four children came out of the house and ran to him; that he said nothing to Susie at any time and had never said during the entire affair that he was going to finish Salomon; that he returned to his house to call the sheriff, but on taking down the telephone heard someone on an extension line calling that officer; that he ordered a doctor called for Salomon.

Salomon lived about 36 hours after the shooting. His attending physician testified that he died from a bullet wound which had caused a paralyzed bowel, a paralytic ileus.

Appellant makes many charges of error which he claims were committed by the trial court. ■ We will first examine the assignment having to do with the admission into evidence of the dying statement of the deceased. Despite the great stress placed upon this point by the appellant we must upon the record here hold that no objection to the introduction of that statement was made. Generally when there is objection to the admissibility of a dying declaration or extrajudicial statements of an accused the jury is excused while the court takes such evidence as the parties wish to introduce upon that issue. When the court has ruled upon the matter the jury is returned and the case proceeds. This was not done. During the examination of Sheriff Carpenter as a witness he testified he had seen Rios in the hospital on two occasions and on one had taken a statement from him; that there were present Hollan Jones, the reporter, and the district attorney; that the statement purported to relate the facts concerning the shooting of Rios by Chand; that Rios had spoken about dying and that Rios had told the witness he, Rios, was dying; that thereupon the statement was taken. At this point the prosecution had marked for identification as the People's exhibit a transcription of what purported to be the statement of Rios. Copies were given to counsel for the defense and one was handed to the court. The prosecution asked the court to examine the document and the court replied after some time that he had examined the first part of it which was sufficient for the moment. The witness was then turned over to the defense counsel for cross-examination and was examined about many things concerning which

he had testified, but no questions were asked concerning the statement of Rios. Thereupon the reporter who took the statement and made the transcription of it was sworn and testified that he did take the statement in shorthand in question and answer form; that he had taken down all the proceedings that took place when the questions were being propounded and the answers given and had made a transcription thereof. He was then shown the document marked for identification and said it was the transcript he had prepared. At that time the prosecution offered in evidence the transcript itself and the following occurred:

By Counsel for Defense: ''We object to it as being irrelevant, incompetent and immaterial and not the best evidence. The Court: Of course it is not the best evidence. The question is, what was the—it isn't the exhibit—isn't really an exhibit to go into evidence, the real question is what questions were asked and what answers were made at that time. [The Prosecutor]: That is correct, Your Honor, I thought it would simplify matters if I gave counsel a copy of it. The Court: He objected, and it is not the best evidence. [The Prosecutor]: Very well, Mr. Reporter, will you read from your original notes the questions that were asked by [of] Mr. Rios by Stevenson and Mr. Carpenter on or about one a. m. on December 29th, 1951, and the answers that he gave thereto? [Counsel for Defense]: Mr. Jones [the Reporter] is trying to do a double handed job there of reporting himself, and to have him read his notes would be an awfully hard job. We have full confidence in Mr. Jones and we will stipulate that he may read it from his transcript. The Court: Very well, Mr. Reporter.''

Thereupon, and without there having been interposed any further objection, the reporter read the transcription of his notes into the record. We cannot predicate error upon this record even if we assume, arguendo, that the dying statement could not have been qualified as such on the point of its admissibility. There was nothing here to tell the trial court that either side desired to make an issue of admissibility. The objection made was clearly to the use of the transcription as evidence and that objection was sustained. No objection was made to the admissibility of the statement itself as a dying statement of Rios. The customary procedure of excusing the jury while admissibility was being tested and ruled on was not invoked and the dying statement was read into evidence without objection and without incident.

Appellant contends the trial court committed error in its actions, conduct and statements during the selection of the jury. When the case was called and the jury box had been filled with prospective jurors the court addressed the panel and informed them of the name of the accused and that the charge against him was murder in that on the charged date he did wilfully, unlawfully and feloniously and with malice aforethought murder Salomon Rios. The court stated that the defendant was presumed to be innocent until proven guilty beyond a reasonable doubt; that the information bringing him to trial did not constitute evidence, and that a selected juror must start in presuming the defendant innocent. The court stated that it was no disqualification to serve as a juror that an opinion had been formed on questions to be tried founded upon public rumor, statements in public journals, circulars or other literature of common notoriety providing it appeared to the court, on the declaration of the juror, that he could, notwithstanding these matters, act impartially and fairly in the cause; that even though a person had read about the case in the newspapers, if he believed he could govern himself by the law and the evidence he would not be disqualified from serving, the reason being that people read newspapers and if all who did so were disqualified from acting in a cause as to which they had read newspapers no one in the county could qualify. The court further stated that the crime charged was one which under certain circumstances was punishable by death and that one reason for challenging was bias in entertaining such conscientious opinions as would preclude the infliction of the death penalty. Thereupon voir dire proceeded and at the close of the first day the court stated that questions of counsel had indicated some matters which he believed required conference before the jury was finally selected. When the panel was called in on the second day the trial judge stated that it was necessary for him to state more particularly the nature of the offense charged. Thereupon he defined murder in the terms of Penal Code, sections 187 and 189, and defined manslaughter in accordance with section 192. The court stated that the two degrees of murder and also manslaughter were all included in the information and said that a person guilty of murder in the first degree should suffer death or imprisonment in the discretion of the jury trying the cause. The court then said, "During the examination yesterday, the District Attorney stated that he was not going to ask for

the death penalty," and that then counsel for the defendant and for the People "in effect entered into a stipulation to that effect." "However," said the court, "it is not for counsel to stipulate whether or not the Jury shall return any specific verdict, so long as the charge stands before the Jury. That charge still stands before the Jury, in which the Defendant is accused of murder in the first degree, and under the law a Juror who entertains conscientious opinions which would preclude him from rendering a verdict finding the Defendant guilty of that offense shall not be permitted to serve or be compelled to serve as a Juror irrespective of any stipulation of counsel."

Appellant first complains that the trial court in effect overstated the lack of disqualification for opinions formed from rumor and reading because many people thus get fixed opinions which do disqualify. Further, appellant says that the court failed to tell the jury that if one had such a fixed opinion which could not be set aside or which might influence the jury adversely that person would be disqualified. ■ The whole statement of the trial court to the jury, as we have related it, appears to have been fair and made only in an effort to be of aid in the selection of a properly qualified jury. If there be any imperfection it was not prejudicial nor was objection made thereto nor was there any request for a further statement than was made. We find no error in these matters.

Appellant next alleges that the court was guilty of misconduct "when throughout the trial, it injected into the case the crime of murder in the first degree, since that degree of crime, as appears from the record, was wholly absent from the case and that issue never should have been submitted to the jury trying the case." Appellant states that the prosecutor "jointly entered into a stipulation in which the District Attorney definitely stated to the prospective jurors and then later to the jury selected to try the case, that he would not ask for the death penalty"; and that the court pointed out to the jurors on its own initative that the charge against the appellant was still murder in the first degree which included the death penalty. Thereby, says the appellant, the judge forced prospective jurors to sit "only if they believed in the enforcement of the death penalty" and that "by that action many good people who entertained conscientious scruples against the death penalty were barred from service as jurors."

■ It was proper for the court to take the action it did.

The statement of the prosecutor, even if it rose to the dignity of a stipulation that he would not ask the death penalty, did not remove the charge of first degree murder from the information nor from the issues to be determined by the jury. If counsel for the defendant labored under that misapprehension, and there is nothing in the record to say that they did, it was incumbent upon them to clear the matter up when the court's statements were made. This they did not do and their inaction was probably due to their thorough understanding that first degree murder was still an issue. One counsel for the accused, when the court had concluded the foregoing remarks, did ask the court to tell the jurors that in what the court had said there was no intimation of any belief on the part of the court in the way of prejudging the case, and to this request the court quite fully and fairly responded. It should be said that counsel for the defense, men of skill and experience, were substituted out of the case when the motion for new trial had been denied. Other counsel were retained to prosecute the appeal. Appellant refers to cases holding that parties to criminal as well as civil actions may dispense with proof of facts through stipulation of counsel, citing, for instance, *People* v. *Hooper*, 16 Cal.App.2d 704, 707 [61 P.2d 370]. The so-called stipulation here was not concerning any proof of any fact. It was but the statement by the prosecution that the death penalty would not be asked. It was nothing more. The trial court was acting with complete propriety when it told the jury what was the truth, that is, that the statement or stipulation that the death penalty would not be asked did not change the issues presented by the information and the plea thereto. These issues could only be changed by amending the information, which was not done. The record is clear that all parties realized that the issue of murder in the first degree was in the case. Everyone knew that the prosecution had said that it would not ask for the death penalty and it did not. But the charge still stood as murder in the first degree along with included offenses and if the jury, persuaded thereto by evidence of a premeditated and malicious killing, had returned a verdict of murder in the first degree and fixed the penalty at death it would have been acting within its province and the court would have been compelled to receive the verdict and impose the appropriate sentence. So long as the charge includes murder in the first degree it is for the jury and not for the prosecutor to say whether a verdict of murder in that degree shall be returned

and if so whether or not the death penalty shall be decreed. It was therefore proper for the court, as the law requires, to see that a jury was selected competent and qualified to pass upon the charge contained in the information and upon the punishment which the law permits therefor. "If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty (Pen. Code, § 1074, subd. 8) constitutes ground of challenge to a prospective juror for implied bias, and in such a case such a person "must neither be permitted nor compelled to serve as a juror." (Code section, *supra*.)

Appellant asserts that the trial court "persistently and with methodical precision committed grave prejudicial error in its rulings on the admission and rejection of evidence in the course of the trial." In support of this general charge appellant sets forth in his brief a great deal of the evidence, including many rulings of the trial court and says that a reading thereof by an unprejudiced mind indicates that the trial court at no time "followed the liberal case law of California." We do not agree. We have read the record and are confident that this general charge is not sustained thereby. Appellant next proceeds to particularize by referring to what he calls "some of the most flagrant rulings." It appeared that a Mexican known as Mora, a close personal friend of deceased, was involved in the family dispute between Chand and his wife, Cirila. ▉ Appellant attempted to prove that by reason of the improper activities of Mora and his fear of him he had applied for and received a permit to carry the gun with which he killed Rios. He also attempted to prove why he feared Mora, and to prove many other matters having to do with Mora, with his relations with the accused's estranged wife, with the machinations of Mora, Cirila Chand and Salomon and Susie Rios in connection therewith, and like matters. All of this evidence was properly excluded. Mora was not present on the property when Chand killed Rios nor was there anything to indicate, nor did Chand testify, that he suspected his presence there. Knowing that Rios was there with his wife, Susie, Chand went from the safety of his living room, where he was surrounded by his children, into the darkness and directly up to Rios where, according to his story, the fatal altercation was initiated by Rios. If he told the truth defendant might well have been found to have been justified in killing Rios. If Rios and Susie told the truth accused might well have been found guilty of pre-

mediated and malicious murder. The fundamental issue was which story was the truth and the jury would not have been aided in determining this by any recital as to the domestic difficulties of Chand or the connection of Mora therewith. Such matters would only have drawn a red herring across the path of those called upon to resolve what after all was a simple issue.

Appellant complains of the conduct of the prosecutor in calling his wife, Cirila, to the stand. He states, what is true, that no one had any doubt the witness was the wife of the accused and therefore he charges that the purpose of placing her on the stand was merely to compel the defendant to prejudice himself in the eyes of the jury by asserting her disqualification as a witness against him. Prejudice cannot be predicated upon these grounds. ■ As was stated in *People* v. *Klor*, 32 Cal.2d 658, 663 [197 P.2d 705] : "Recent authority is to the effect that if the prosecution desires to use the husband or wife of the defendant as a witness the proper procedure is to offer the spouse as a witness, subject to the claim of privilege by the defendant."

■ When Susie Rios was cross-examined it was sought to elicit from her many matters as tending to show her bias and prejudice in the case. These had to do again with the activities of Mora; with his relations with Mrs. Chand; with the claim that Salomon and Susie Rios, Mora and Cirila Chand had all gone to Mexico while Chand was absent on a trip to India; with the claim that Chand had informed against Mora and Salomon and Susie Rios as being illegally in the United States; and with the claim that on his return from India Chand had discharged Susie as an employee for counseling Cirila against him and urging her to leave him and her children and run away with Mora. Undoubtedly these matters would have tended to establish bias and prejudice on Susie's part against Chand. But on such matters the trial court must often exercise a wise discretion as to how far into collateral and disconnected affairs an inquiry for the purpose of establishing bias and prejudice may go. It was already in evidence that Susie had lost her husband by the hand of Chand; that she had been discharged as his employee and that she was plaintiff in a suit against Chand wherein she sought to recover $25,000 from him as damages suffered by the loss of her husband. It is hardly to be supposed that the jury were unaware they were listening to a biased and prejudiced witness who might well be quite bitter against the accused. "It has been said fre-

quently that the conduct of the cross-examination of a witness is within the discretion of the trial court, and that the appellate court will not interfere except upon a showing that such discretion has been abused.'' (*Ghiglione* v. *American Trust Co.*, 49 Cal.App.2d 633, 639 [122 P.2d 301].) We find no error in this assignment. In line with the foregoing appellant contends he was wrongfully prevented from showing on the cross-examination of Susie Rios the following additional matters: 1. That Mora had been given groceries without charge by Susie Rios while she was working in appellant's store; 2. That Susie had told Cirila she had better get some money from Chand if she was going to leave him; 3. That Susie had participated in a property settlement which was being made between Cirila and Chand; 4. That she had questioned an inspector of immigration as to who had informed against her in respect of her entry into the United States. It was the position of the trial court that these collateral matters could not properly be gone into merely to show bias and prejudice on the part of the witness since enough had been shown to make it appear that she was affected by such bias and prejudice. We think the court was well within the bounds of discretion in limiting the cross-examination as it did.

Appellant contends that his own examination while a witness in his own behalf was unduly limited by the trial court. The court refused an offer to show the particulars whereunder he received from the sheriff of the county leave to carry a concealed weapon. The fact he had such a permit was shown and the permit was introduced in evidence, but appellant's counsel sought to show further that the permit was sought by accused after having received a telephone call from Mora. These rulings likewise were within the proper discretion of the trial court, and this is particularly true in view of the fact that it was Rios who was killed and not Mora.

Appellant contends the trial court committed error in its instructions to the jury respecting murder in the first degree with reference to the death penalty when as appellant charges ''the evidence in the case, as a matter of law, failed to justify any such instructions.'' Herein appellant says it is his position that the record of the case as a whole failed to establish one iota of evidence of murder in the first degree, including the death penalty. We have hereinbefore stated in short summary the evidence given. We think it clear that appellant errs in his conclusion that the evidence would not have legally supported a first degree verdict with infliction

of the death penalty. From that evidence the jury could have inferred that under the impulsion of the wrongs he believed Rios had inflicted on him in respect of his marital relations appellant, knowing Rios was on the place in defiance of his orders sat in his dwelling brooding upon these matters until he determined to go out and take the life of Rios; that pursuant to that resolve he went out with flashlight and gun and proceeded straight to the breast of decedent into which he sent two bullets; and that fearing when Rios still managed to run he had not inflicted death upon him he pursued him with the intention of finishing the task he had undertaken. Of course we do not say such was the fact for that is a matter beyond the scope of review. But clearly the jury could have so viewed the entire situation for here there could have been found premeditation, deliberation and malice eventuating in the purposed killing of the deceased. The court, therefore, was not only justified in instructing the jury fully on the subject of homicide but would have failed in its duty had it not done so. In this connection appellant states that the trial court failed to properly instruct the jury on what constitutes murder in the second degree and manslaughter. It is not clear as to what specific lack in the instructions this assignment is directed. We have examined the instructions given and find that they correctly and adequately state the law on all degrees of murder and of manslaughter. It would serve no useful purpose to discuss the instructions in detail.

The judgment and the order appealed from are affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied March 7, 1953, and appellant's petition for a hearing by the Supreme Court was denied March 19, 1953. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.