[Crim. No. 20773. Second Dist., Div. Two. Mar. 1, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEXANDER GIBSON, Defendant and Appellant.

918

COUNSEL

James T. Lindsey for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Lawrence P. Scherb II, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

COMPTON, J.—Defendant was convicted in a trial by jury of first degree murder (Pen. Code, § 187). He was sentenced to life imprisonment. He

purports to appeal from the "verdict, judgment and sentence" and from the order denying a motion for new trial.

Only the judgment is appealable; however, all defendant's claims of error are reviewable on appeal from the judgment.

The facts may be summarized as follows: On January 4, 1971, the defendant fired a single shot into the head of his 12-year-old son causing his almost immediate death. He called the police, informed them of the killing and was taken into custody at the scene. At the initial meeting with the arresting officers the defendant appeared to be calm and rational and in possession of his faculties. His constitutional rights were read to him from a *Miranda* advisement card, and he again stated that he had killed his son. He did not appear, at this time, to be confused, irrational, or in any type of trance or pain.

The deceased son was described by his mother as an autistic child who was unable to speak, had no empathy, failed to relate to sadness, was self-destructive and hyperactive, with a sexual orientation which was causing his parents concern because of fear that he might harm someone.

A psychiatrist described infantile autism as one of the most severe, if not the most severe form of childhood mental disorder. It is characterized by failure to talk, severe motor disturbances, compulsive repetitious behavior, inability to learn, and problems with interpersonal relationships. The autistic child frequently becomes the focal point of his family because of the needs and demands he generates. Many times the family structure is severely disturbed by the intense and constant preoccupation with the problems of the autistic child.

Defendant had suffered from a severe heart condition since approximately 1958 and had suffered an attack as recently as the day before the killing of the son. The years of hopeless search for assistance for the autistic son, coupled with physical deterioration of the defendant as a consequence of his heart disease, was proffered by defense to prove that defendant's mental state at the time of the offense was such that he could not by reason of diminished mental capacity form the degree of intent requisite for first degree murder.

The defense relied upon the testimony of a single psychiatrist in advancing the proposition that defendant had a diminished capacity to deliberate and premeditate.

The jury was fully and properly instructed that a defendant cannot be

convicted of murder of the first degree if at the time of the alleged offense he was operating under a mental disability not amounting to legal insanity which would prevent him from acting with malice aforethought or with premeditation and deliberation. (*People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Henderson,* 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Baker,* 42 Cal.2d 550 [268 P.2d 705]; *People* v. *Ford,* 65 Cal.2d 41 [52 Cal.Rptr. 228, 416 P.2d 132]; *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53].)

The determination of the degree of the crime is a matter for the jury (*People* v. *Simpson,* 43 Cal.2d 553 [275 P.2d 31]), and the opinion of an expert is not binding on the trier of fact. (*People* v. *Gentry,* 257 Cal. App.2d 607 [65 Cal.Rptr. 235]; *People* v. *Williams,* 151 Cal.App.2d 173 [311 P.2d 117].)

There was substantial evidence to support the judgment of first degree murder found by the jury. (*People* v. *Tubby,* 34 Cal.2d 72 [207 P.2d 51]; *People* v. *Ford, supra,* 65 Cal.2d 41; *People* v. *Bassett,* 69 Cal.2d 122, at p. 138 [70 Cal.Rptr. 193, 443 P.2d 777].)

All evidence which bears on the subjective state of mind of an individual, except for his own description of his thought processes, is necessarily indirect evidence. Here that indirect evidence took the form of the opinion of the psychiatrist on the one hand and the objective conduct of the defendant on the other. The defendant did not testify.

The inference of the defendant's lack of premeditation and deliberation which could be drawn from the opinion evidence was obviously not as persuasive to the trier of fact as the opposite inference of the existence of those thought processes which could readily be drawn from the defendant's motive, the fact that shortly after committing the crime he was rational, cooperative, coherent and well oriented as to time, place and persons present. (See *People* v. *Wolff,* 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959].)

The psychiatrist's testimony was to the effect that the defendant's "judgment" was impaired. It could be said that anyone who resorts to criminal homicide as a solution to his problems fails to exercise "good judgment," however, the social policy underlying the law of homicide does not recognize that concept as mitigating the gravity of the crime. Nor does that social policy yet mitigate the gravity of a deliberate intentional killing when the motive appears to be other than one that is truly base in nature. Thus euthanasia, at this point in history, is not countenanced in California.

Here there was a total absence of any evidence that defendant was delusional or out of contact with reality. (Cf. *People* v. *Wolff, supra.*)

Defendant next urges reversible error in the fact that the prosecution, after having declared its intention not to seek the death penalty challenged six jurors for cause on the basis of their stated opposition to the death penalty. The defendant maintains that this procedure resulted in an improper weighting of the jury in favor of the prosecution.

In *People* v. *Chand,* 116 Cal.App.2d 242 [253 P.2d 499], the court was faced with an identical situation. The court there stated at pages 249-250: "So long as the charge includes murder in the first degree it is for the jury and not for the prosecutor to say whether a verdict of murder in that degree shall be returned and if so whether or not the death penalty shall be decreed. It was therefore proper for the court, as the law requires, to see that a jury was selected competent and qualified to pass upon the charge contained in the information and upon the punishment which the law permits therefor."

We note too that here the prosecution had not utilized all its peremptory challenges. Thus the prosecution would have been able to remove the challenged jurors in any event. There was no error in the procedure that was followed.

■ The defense next contends that the reading of the jury instruction approved in *People* v. *Ortega,* 2 Cal.App.3d 884 [83 Cal.Rptr. 260], and *People* v. *Baumgartner,* 166 Cal.App.2d 103 [332 P.2d 366], was prejudicial error since it contained an impermissible element of coercion which would affect the free choice of a holdout juror.[1] This issue was

---

[1] "'The Court: In a large proportion of cases and perhaps strictly speaking, in all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions and not a mere acquiescence in the conclusion of his or her fellows, yet in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this view, it is your duty to decide the case, if you can conscientiously do so. In order to make a decision more practicable, the law imposes the burden of proof on one party or the other in all cases. In the present case, the burden of proof is on the People of the State of California to establish every part of it beyond a reasonable doubt. And if in any part of it you are left in doubt, the defendant is entitled to the benefit of the doubt and must be acquitted. But in conferring together, you ought to pay proper respect to each other's opinions and listen with a disposition to be convinced to each other's arguments. And

extensively treated in *People* v. *Ortega, supra,* and in *People* v. *Walker,* 112 Cal.App.2d 462 [246 P.2d 1009]. From these cases and others cited by them the rule appears clear that the cited instruction is a proper vehicle for providing the jury with a deliberative approach to settling differences in opinion among their members.

When, as here, the instruction is given without revelation as to how the jury stood on the question of guilt, and when, under the circumstances of its use, is merely an adjuration to careful and dispassionate discussion and consideration of all issues, there is no element of coercion present. (*People* v. *Walker, supra,* 112 Cal.App.2d 462 at p. 472; *People* v. *Ortega, supra,* 2 Cal.App.3d 884; *People* v. *Lammers,* 108 Cal.App.2d 279 [338 P.2d 667].)

Defense further maintains that the *Ortega* instruction is in conflict with CALJIC Instruction No. 17.40 given in this case with specific reference to the following portion: ". . . However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision."

Defense urges that the *Ortega* instruction calls upon a holdout juror to measure his quantum of reasonable doubt against that expressed by the majority of his fellows in order to arrive at a qualitative assessment of the validity of his own doubt.

A fair reading of the *Ortega* instruction reveals that it is only a suggested approach to a thought process. In no way can it be said to call for a recalcitrant juror to substitute other's reasoning for that of his own merely because he finds his analysis or decision at odds with the other jurors. To simply call upon a juror to consider all varying opinions on a subject in arriving at a decision one way or another cannot be said to be coercion.

The judgment is affirmed.

Herndon, J., concurred.

---

on the other hand, if much the larger of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women equally honest, equally intelligent with himself or herself and to have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath. And on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows. That is given to you as a suggestion of the theory and rationale behind jurors coming to a decision one way or the other.' " (*People* v. *Ortega,* at p. 896.)

**ROTH, P. J.**—I dissent.

The only evidence received on the defendant's mental state prior to and at the time of the crime was offered by the defense, elicited from Dr. James Wells, a psychiatrist. The majority characterize the expert's testimony as the "proposition" that defendant's capacity to deliberate and premeditate was diminished. The majority fail to make clear that it is the *only* evidence in the record specifically directed to defendant's mental capacity and that it demonstrates that defendant's mental capacity *was diminished.*[1]

The majority proceed on the assumption that there was substantial evidence to support the judgment of first degree murder. It must be conceded that unless evidence resulting in a verdict of first degree murder is *substantial,* no court can or should affirm a conviction for that offense. (*People* v. *Bassett,* 69 Cal.2d 122, 138-139 [70 Cal.Rptr. 193, 443 P.2d 777].) I am unable to agree that the evidence at bench is "substantial," when the inherent nature of the crime, fortified by uncontradicted testimony of a concededly reputable expert indicating diminished capacity, is rejected for no apparent reason. A jury's discretion to fix the degree of a crime is not absolute. (*People* v. *Tubby,* 34 Cal.2d 72, 76 [207 P.2d 51].)

It seems to me that there should be apparent from the record reasonable and logical inferences to reject the uncontradicted psychiatric testimony. Indeed the law enjoins such rejections for fanciful, imaginative or for personal reasons. (*People* v. *Bender,* 27 Cal.2d 164, 186 [163 P.2d 8].)

The mental elements of premeditation and malice requisite for first degree murder may, of course, be proved by circumstantial evidence. At bench, those two legal prerequisites, assuming complete rejection of the

---

[1]The majority admit that such is the state of the record but discount it with the statement: "All evidence which bears on the subjective state of mind of an individual, except for his own description of his thought processes, is necessarily indirect evidence. Here that indirect evidence took the form of the opinion of the psychiatrist on the one hand and the objective conduct of the defendant on the other. The defendant did not testify.

"The inference of the defendant's lack of premeditation and deliberation which could be drawn from the opinion evidence was obviously not as persuasive to the trier of fact as the opposite inference of the existence of those thought processes which could readily be drawn from the defendant's motive, the fact that shortly after committing the crime he was rational, cooperative, coherent and well oriented as to time, place and persons present. (See *People* v. *Wolff,* 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959].)"

psychiatric testimony, admittedly may be legally inferred from the uncontradicted surface facts presented by the majority. It is clear that the defendant thought about the killing, loaded, aimed and fired the weapon and thereafter notified the police of the awful deed. Direct or circumstantial evidence of the type of passion, anger, viciousness, or the type of premeditation and malice harbored by a vengeful or inflamed but undiminished mentality usually present in every first degree murder case are wholly absent. To the contrary, the record abounds with evidence showing that over a long period of years appellant's mind was so infected with the multiple virus of paternal guilt, helplessness, hopelessness and vicarious suffering, that appellant's thinking on the subject of his unfortunate child at the time of the killing was tortured, warped and diminished beyond repair, and that the only possible motive was appellant's muddled judgment that death of the victim was the only answer to ". . . the years of hopeless search . . ." to help his unfortunate son.

The quoted phrase is that of the majority. The record shows devotion, love and understanding of defendant toward his son for the full period of the latter's life and a continuous, conscientious and heartrending as well as "hopeless search" made, with sacrifice of substantial expenditures of thought, time and money. The relationship between the victim and his father is a devastating rebuttal of any inference that defendant had "an abandoned and malignant heart" (Pen. Code, § 188; 1 Witkin, Cal. Crimes, pp. 289-290.)

Dr. Wells, an expert of undoubted reputation, with 22 years in the practice of psychiatry, who, the record shows, was frequently used by the trial court, was the only expert who testified. He recited an abundance of background and current facts and made significant psychiatric observations, fortified by psychiatric findings and conclusions from the same as to which he was rigorously and intelligently cross-examined, indicating almost infallibly diminished mental capacity, as that term is defined in the cases. (*People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Mosher,* 1 Cal.3d 379, 389 et seq. [82 Cal.Rptr. 379, 461 P.2d 659].)

His direct evidence covered approximately 18 pages of the reporter's transcript and the cross-examination 72. No part of his testimony is refuted or even shaken. It is difficult to believe beyond reasonable doubt that defendant had sufficient control of his mental processes to have harbored the type of premeditation and malice required as conditions precedent for conviction of murder in the first degree. A few brief excerpts of the expert's testimony which relate to the whole as does the crest of an

iceberg, demonstrate defendant's tortured, warped and diminished mental process.

". . . He certainly saw himself as the guilty person in regard to Doug's illness, and certainly took the responsibility for Doug's death. He was very remorseful, suppressed, remorse, and I was convinced that he was remorseful primarily in terms of the harm that he thought he had done his family by this act. He made it very clear that at the time that he made the decision to end Doug's life, he was convinced that the entire family would turn away from him and leave him to whatever punishment might be met as a result of this action; that he had been shocked and surprised that the family had ralied [*sic*] around him, and felt more than ever that he had hurt them by this action. I think that at the same time perhaps in some respects there is a sense of relief for Doug from his point of view."

Recounting one of the interviews with defendant in jail, the doctor testified:

"On each occasion when I arrived at the jail, Mr. Gibson was in solitary confinement up on the—whatever it is, fourth or fifth deck—and a very secluded area. He indicated that it was his preference that he be in that area. He said that it was partly at his request that he be there. He stated that he was taking—that he had two medications, internal cardiac medication, nitroglycerin, another medication used to relieve the spasm we mentioned earlier. That he had been quite upset when first placed in a cell block, that he was particularly upset because of the abuse of a mentally defective prisoner by the other prisoners in the cell. That they had forced this prisoner to dance in the nude and other activities in the absence of the jailer and mocked him. Mr. Gibson felt powerless to intervene physically, but was in time able to inform the jailers of this, and subsequently he was removed from his cell. He made the comments that it roused images in his mind to the possibility of Doug being treated in the same fashion."

Testifying as to defendant's reactions when the decedent was in Camarillo, the doctor related that the defendant told him:

" 'We got him into Camarillo. It was so pitiful. They didn't do anything for him.' This was Mr. Gibson's opinion, of course. He added that they could go get Doug every weekend and take him out for visits with the family. Mr. Gibson was hoping—he told me this—he said, 'He had to hold my hand all the way home. He got so skinny. We had to stop and get something to eat—a hamburger and French fries'—which he had explained earlier were one of Doug's favorite foods. 'I hated to take him back. The doctor said it was best for me. Oh, he hated to go in that

place. He was there four months or so. They wrote and told us to come and get him, that they couldn't do anything. I was actually glad. It was so pitiful. He had lost so much weight. He didn't have any table manners when he came back.' "

". . . . . . . . . . . . . . . . . . . . . . . . .

". . . . A. Yes. My opinion is that at the time, Mr. Gibson was suffering from a very significant degree of depression. He stated that he had been wrestling with the possibility of this action for approximately two months. He had made a decision, the day prior to the act that it must be done. I perhaps should add parenthetically that Mrs. Gibson made the observation on the Sunday prior, that would have been the 3rd, that she noticed a very marked change in her husband that day. She was not aware why, but he seemed much more depressed. In any event, I do believe that Mr. Gibson has been suffering from a severe chronic state of mental depression brought about by a breakdown of his own emotional competence because of his own failing health certainly exacerbated and accelerated by the family problems, preoccupations and concerns with Doug, and his illness and obsessive concern with the prospects of the future for Doug; also exacerbated by another family strife including the estrangement from the younger daughter; a feeling of guilt and responsibility on his part for the actions or for the boy's illness and for some of the other family problems including his daughter's actions, and that this state of mind, this depressive state, did bring about a marked alteration in his capacity to exercise full judgment. I do not believe that he was in any way out of contact. He was aware of where he was and what he was doing, this type of thing. I think it could be said to be aware of the consequences of his actions, but very emphatically he was suffering from a significant degree of emotional disorder.

"Q. Doctor, in your opinion, would that state of mind that he had on January 4 of this year have impaired his judgment?

"A. Yes, I definitely think so.

"Q. And would that state of mind on January 4, 1971, have impaired his capacity to reason?

"A. Yes, I believe so.

"Q. And would that state of mind that he had on January the 4th of

this year have impaired his capacity to fully understand the nature and quality of his actions?

"A. I believe so.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Well, could you explain what, to a psychiatrist, then, the difference between understanding something is on the one hand, I guess, and fully understanding something on the other hand; are these two different concepts to a psychiatrist?

"A. I don't know that it is necessarily a psychiatric technicality that we are concerned with here, Mr. Minier. I think it is a matter of simple understanding that there are levels of which we can understand anything, and I think at a very simple uncomplicated level, Mr. Gibson was aware of what he was doing when he made a decision to end his son's life. He knew that when he took a gun and pointed it at the boy and pulled the trigger what would happen, but I am saying that there was impairment of his judgment and of his reason and of his motivation, that there was distortion in his motivations in so doing.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"A. Yes. I am thinking of abstracts of a sort, of things of his own thinking at the time. For example, that in so doing, he would be a pariah and would be totally separated from his family who would then not be hurt by his act. I am thinking of the fact that he acted out of an absolute conviction that Doug was faced with a future of pain and torture and discomfort at the hands of others without truly knowing this, but this was his conviction at the time. I am thinking that he had assumed a tremendous burden of guilt and responsibility for this child's illness. Far out of keeping with the facts, we don't know the cause of this kind of illness, but I think he was convinced that he was the present cause."

Significantly, at one point in the record, Dr. Wells testified: "Now, in your judgment then, was Mr. Gibson able to maturely understand the nature and the gravity of the act of the killing of his son at the time that it happened? A. Not in my opinion."

Among other things, referring to appellant's attempt at suicide in 1966, Dr. Wells said: "It was partially because the family didn't want noteriety that he was treated at home rather than hospitalized, and his wife states that he did not wake up for over 24 hours, and she also describes the fact that there was a purplish dusky hue to the skin at the time that he was

found. *The reason that I think this is significant is because he may have been in this condition long enough to have severely embarrassed the blood supply and oxygen supply to the brain* so that it may have been a contributing factor to some of the personality changes that seem to have taken place. We all, of course, have some increasing memory deficit as the years accumulate. But there are some occasions that the wife noted that his memory and recall perhaps was not as good as subsequently." (Italics added.)

There was substantial evidence to show distinct personality changes in appellant after the suicide attempt. In fact, during the entirety of his extensive testimony, on cross-examination, Dr. Wells maintained his opinion that defendant's mental capacity to understand the nature of his act had been impaired, going so far as to state that defendant's diminished capacity regarding the murder of his son continued to the time of trial.

In this respect, the following questions were put to the doctor:

"Q. Other than the fact that the defendant had this diminished capacity, he does not fall into any of those classes, those psychiatric classes or what we call classes of psychiatric disorders, does he?

"A. Well, surely I think he would.

"Q. What is he then?

"A. I think that he is suffering from a reactive depression or, excuse me, a depression reaction. I think there is some question not completely answered as to whether or not his depression at times has been of psychotic proportions. Certainly he was suffering from a clearly—from a neurotic depressive reaction, and he may very well have, at times, reached a point where *his reality testing was sufficiently disturbed that would be described as a psychotic depressive reaction.*" (Italics added.)

"Q. Is he psychotic as he sits here today?

"A. I don't know for sure. I doubt it.

"Q. Was he psychotic when you interviewed him in the jail?

"A. No, I don't think that he was.

"Q. Is he neurotic as he sits here today?

"A. Yes.

"Q. You can tell just by looking at him?

"A. I can give you an opinion.

"Q. Was he neurotic when you interviewed him in the jail?

"A. Yes."

Dr. Wells also stated that the defendant's long history as a heart patient may have affected his mental processes. Significantly, the prosecution produced rebuttal testimony *on this* latter point—to the effect that heart patients do not undergo personality changes—but it failed to produce any testimony or evidence regarding the effects of the blackout suffered by appellant after the suicide attempt nor, as appears above, was there any direct showing in rebuttal concerning the ultimate issue, namely the defendant's diminished mental capacity.

When the testimony of an established and reputable psychiatrist, fortified by the inherent nature of the crime, is completely ignored and when neither the state nor the majority can point to *any* evidence except technical legal inferences flowing from the fact of the killing which supports premeditation and malice, fulsome and blind submission to and acceptance of the jury's finding that those two indispensable elements were present, is an obeisance not required of any court, trial or appellate. (See *People* v. *Wolff, supra,* 61 Cal.2d 795; see *People* v. *Bassett,* 69 Cal.2d 122; see *People* v. *Anderson,* 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942].)

A murder such as the one at bench cannot be excused but when Gibson, ill in body and mind, shot his son, the jury should have recognized the difference between a homicide requiring "more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intention to kill." (*People* v. *Wolff, supra,* 61 Cal.2d 795, 822.)

The court found there was no substantial evidence in *Wolff* to support premeditation. At bench there is no substantial or any evidence to support premeditation or malice. In my opinion, the evidence at bench sustains a judgment of voluntary manslaughter. (*People* v. *Conley, supra, People* v. *Mosher, supra.*) The *Conley* instruction was given, but apparently because the psychiatric evidence was ignored or rejected by the jury, it was not followed.

I would modify the judgment to voluntary manslaughter, and as so modified, I would affirm.