[Crim. No. 4955. In Bank. Mar. 23, 1949.]

THE PEOPLE, Respondent, v. HAROLD C. RYE, Defendant; ALBERT E. NIXON et al., Appellants.

Ernest Spagnoli for Appellants.

Fred N. Howser, Attorney General, and Walter L. Bowers, Assistant Attorney General, for Respondent.

EDMONDS, J.—By information, Albert E. Nixon and Jesse A. Murphey were accused of having murdered William R. Reynolds. In five other counts they were charged with robbery committed while armed with a deadly weapon. Harold C. Rye was named as a codefendant. All three men pleaded guilty to the crime of murder and to two of the charges of robbery; the remaining counts were dismissed on motion of the district attorney. Upon a hearing to fix the degree of the crimes, the homicide was found to be murder in the first degree and the robberies also were determined to be of the first degree. As the penalty for the crime of murder, Nixon and Murphey were sentenced to death, and the judgment in that regard is before this court under the provisions of section 1239(b) of the Penal Code. There is no appeal by them from the judgments of conviction upon the two counts of robbery. Rye was sentenced to life imprisonment and did not appeal.

At the time the three defendants were arraigned, they waived counsel and each of them expressed his intention to plead guilty. The trial judge then stated: "This case is of such a nature that I do not feel justified in proceeding to receive the plea of the defendants without their having the opportunity of discussing the matter with counsel. And regardless of the statements of the defendants that they do not wish attorneys, I am going to appoint counsel in any event, because the gravity of the matter is such that I do not want to accept the plea until you and each of you have had an opportunity to talk the matter over with competent counsel." An attorney was appointed to represent each of the defendants and the matter was continued. Later, at the request of counsel, a medical expert was appointed by the court to aid the defendants in analyzing the autopsy

report, and a continuance was granted, first for five, and then for an additional two, days.

When the case again came on for hearing, the three defendants, in the presence of their counsel, entered pleas of guilty and a time was set to take evidence for the purpose of determining the degrees of the crimes with which they were charged. Witnesses were heard on four days and each defendant testified at length under examination by their counsel. The record also shows full and exceedingly competent cross-examination of each witness who testified for the People. Throughout the entire proceeding, there was scrupulous regard for the defendants' rights. For example, at one point the trial judge stated: "Because the condition of the record is such that the lives of these defendants are in jeopardy, I don't want to permit any testimony to come in that could possibly in the slightest way be improper...." And again: "I do not want to handle this case hastily. I don't want any act connected with it to be hasty."

The transcript of the proceedings discloses the following: All of the defendants were migrant camp workers. Nixon and Rye had known each other for about two months prior to the homicide. In Watsonville they met Murphey. Because all three of them had been drinking quite heavily, they were arrested and placed in jail. The next day they were released and given an hour to leave town. With the intention of going to Firebaugh to pick cotton, they traveled by train to Tracy. That night, they had a "party" and drank a considerable amount of wine. The following morning they drank the remaining quart of wine and then went to work picking tomatoes. They drank more wine while they worked and by 4 o'clock in the afternoon, when they quit and prepared to continue their journey to Firebaugh, they had consumed six fifths of Tokay wine.

Varney R. Hargett, a witness for the prosecution, was with the defendants in Watsonville when "[t]he law walked up and carried us in." He accompanied them to Tracy. The four men got on the freight train and found a place to ride on a flatcar situated between two boxcars. There were a caterpillar tractor and a bulldozer on the car and four other men. The other four were Bedford Lee, an 81-year-old Negro; Louis Bauer, a machinist who had been on the train from the time it left Stockton; Cruz Certantez, a one-armed Mexican; and William R. Reynolds, the victim of the homicide.

Before boarding the train, Nixon, Murphey and Rye purchased one-half gallon of wine for the trip. After the train pulled out of Tracy, the wine was passed around and all of the men drank some of it, although the largest part was consumed by the defendants. They testified that at this time they were "feeling pretty good" but that they knew what they were doing.

The train passed Firebaugh without stopping and went on to Los Banos. Although there is a conflict in the testimony, it shows that some time before arriving at Los Banos, the defendants took out their knives and proceeded to take money and clothing from the others. Lee's wallet and $7.44 in cash were taken from him. Certantez gave up a leather jacket. Rye "traded" shoes with Reynolds and took his overcoat.

When the train reached Los Banos, Nixon left the flatcar after directing Murphey and Rye to see that no one else did so. The latter pulled out their knives and everyone remained on board. Nixon asked a man named Smith where he could buy some liquor. Nixon went to a store to which he was directed by Smith and purchased a gallon of wine. They then returned to the train. When Smith climbed on to the flatcar he noticed that something was wrong and started to leave but the defendants told him to remain.

It was after sundown and becoming dark when the train pulled out of Los Banos toward Fresno. The testimony of the defendants about this part of the trip is very vague. They all remembered, in varying degree, that the wine was passed around, that there was some scuffling, and that the deceased got "roughed up" a bit. The testimony of the other men was considerably more detailed although, to a certain extent, contradictory. Everyone admitted that it was getting dark and visibility was restricted.

While the defendants walked around the car all of the other occupants remained seated. Lee, Certantez, Bauer, and Reynolds, in that order, sat on the floor with their backs against the bulldozer. Smith and Hargett, apparently in the good graces of the defendants, sat by themselves and were unmolested.

According to Rye, Reynolds called him a "tramp robber" and a "fruit thief." Rye thereupon slapped Reynolds with a pair of gloves, previously taken from him, and kicked him in the hip. Nixon and Murphey then came up and struck

and kicked Reynolds. There is considerable testimony as to "stomping" on Reynold's head and shoulders. Although pleading for mercy in the early stages of the attack, it appears that Reynolds soon lost consciousness. One or both of the other defendants also kicked and beat Bauer, Certantez and Lee, to a lesser degree, but because of the darkness there is a lack of positive identification of the assailants at various times.

After the beating was concluded, Rye took a Bible which one of the defendants carried and, holding the Bible in one hand and a knife in the other, "made the rounds having these guys to swear that they hadn't seen anything." The defendants then climbed on the adjoining boxcar, where they remained until they left the train at Fresno. They were arrested after they had made their way to Madera .

Reynolds' body was embalmed in Fresno and, en route to New Jersey, an autopsy was performed by the Coroner of Los Angeles County. Because of the embalming, it was impossible to make a blood test but the cause of death was found to be acute coronary insufficiency due to traumatic shock. Although the heart condition alone could have caused death at any time, the testimony of the deputy assistant coroner and of an expert appointed by the court was that the physical difficulty was aggravated by the trauma.

Nixon and Murphey now make three main contentions: (1) the homicide did not occur in the perpetration of robbery within the meaning of section 189 of the Penal Code; (2) the drunken condition of the defendants was sufficient to negate any malice, premeditation or deliberation, therefore the crime was at most manslaughter; and (3) the evidence as to the heart condition of Reynolds was sufficient to establish that death was caused by the slapping and kicking of Rye, before either of the other defendants attacked the unfortunate victim.

But there is substantial and almost overwhelming evidence that Reynolds was killed in the commission of the crimes of robbery within the meaning of section 189 of the Penal Code. After each of the defendants drew a knife, they took from the other riders on the train, "by means of force or fear," property they had on their persons. Reynolds was directed to "trade" shoes with one of the defendants, while the latter held an open knife. Although the robberies took place a considerable time before the beating which led to the death of Reynolds, it was a part of the perpetration of those crimes. To protect themselves against discovery, the defendants held everyone on the flatcar at Los Banos, and

when Smith joined them they refused to let him leave. Nixon testified on cross-examination that he struck Reynolds to keep him from attracting attention. When asked if he had "done anything to him up to then," Nixon replied: "Well, no. But we would have been implicated in this robbery." To the following question, "And so you wanted to quiet him down so that he wouldn't report a robbery to anybody?" the witness answered, "That is right."

All of the defendants' acts, from the time when they took the money and clothing of their companions until they left the car, were one continuous integrated attempt to successfully escape after the perpetration of the robberies. Everyone on the train was kept under constant threats and the purpose, at least in part, of beating Reynolds was to prevent discovery of their criminal acts. Under these circumstances, the trial court was fully justified in concluding that unquestionably the homicide was a murder of the first degree. As this court has said: "... [T]he continuation of the use of arms which was necessary to aid the felon in reducing the property to possession is necessary to protect him in its possession and in making good his escape. Robbery, unlike burglary is not confined to a fixed *locus*, but is frequently spread over considerable distance and varying periods of time. The escape of the robbers with the loot, by means of arms, necessarily is as important to the execution of the plan as gaining possession of the property." (*People* v. *Boss*, 210 Cal. 245, 251 [290 P. 881]; *People* v. *Dowell*, 204 Cal. 109 [266 P. 807].)

At the time of the robbery the defendants were "feeling pretty good" but admittedly they "could get around" and knew what they were doing. Clearly, one motive for the robbery was to obtain money with which to purchase wine in Los Banos. It is, therefore, of no consequence, as argued by the appellants, that at the time of the attack on Reynolds they were too drunk to deliberate or premeditate. Inasmuch as the homicide was committed in the perpetration of the robbery, it is not even necessary that there be an intent to kill. (*People* v. *Kaye*, 43 Cal.App.2d 802 [111 P.2d 679].) Further, there was direct testimony that at the time the appellants beat Reynolds they were not drunk and, in answer to pleas of Reynolds that he did not want to die, one of the defendants said, "Well you are going to die, anyway."

The appellants' third contention is wholly without merit. The supposition that Reynolds died solely as a result

of the kick from Rye is contrary to the testimony of two medical experts and all of the witnesses, including the defendants, who agreed that he was alive and protesting when the appellants beat and ''stomped'' him.

The judgments are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellants' petition for a rehearing was denied April 21, 1949.