[Crim. No. 7449.   Second Dist., Div. Three.   June 8, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. GEORGE WILLIAM BURKS, Defendant and Appellant.

George William Burks, in pro. per., for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Edmond B. Mamer, Deputy Attorney General, for Plaintiff and Respondent.

SHINN, P. J.—Appellant and Larry Gene Gallegos were jointly accused by amended information in one count of robbery, and two counts of kidnaping for the purpose of robbery. It was alleged in Count I of the information that on February 29, 1960, appellant, while armed with a deadly weapon, took $176.76 from the immediate presence of James and Marcene Holmes by means of force and fear. It was also alleged that appellant had been previously convicted of the crime of violation of the Dyer Act by breaking and entering a post office, a felony; and had served a term of imprisonment therefor. Appellant, with counsel present, pleaded not guilty and denied the prior conviction.

When the case was called for trial appellant admitted the prior conviction. The jury found appellant guilty of all counts, found the robbery to be in the first degree and the kidnaping for the purpose of robbery to be without bodily injury. The jury also found that appellant was armed at the

time of the commission of the offense. The court denied probation and ordered the sentences as to all counts to run concurrently. This appeal, in propria persona, is from the judgment.

Upon application for appointment of counsel on the appeal an attorney was appointed. It appears that the attorney advised defendant that he was of the opinion that defendant had been subjected to a double punishment and that he proposed to urge that point on appeal. Defendant was dissatisfied and requested that the attorney be released from further representation and that he be appointed to represent himself. This request was granted. It appears further that defendant has been in consultation with another attorney, although he has continued to act in propria persona. Over a period of a year and a half the court has ordered the record augmented, has considered various motions of defendant, and has extended his time for filing a brief. He has filed a brief of 88 typewritten pages which clearly shows that he has had the assistance of one versed in the law.

James Holmes was a bartender at the Winners Circle Bar in San Dimas on the night in question. After the bar had closed at 2 a. m. Holmes and his wife stayed in the bar for about an hour to clean up and arrange for the next night's business. When they had finished they proceeded to leave the bar by the rear door. Mrs. Holmes went out first and Mr. Holmes turned out the lights and followed. Their car was parked a short way from the back door. Mrs. Holmes walked to the car, got in, started the motor and turned on the headlights. As Mr. Holmes walked out the back door a man wearing gloves and holding a revolver in his hand said: ''Get down on the ground,'' which Mr. Holmes did. At approximately the same moment another man opened the car door, ordered Mrs. Holmes to give him the keys and alight from the vehicle. This she did and the two of them walked over to her husband who was lying on the ground. The robbers then ordered Mr. Holmes up, had him open the door and the four of them went back inside the bar. Once they were inside the robbers told them they wanted the money. At this point the victims were walked around to the opposite side of the bar and asked just where the money was located. Mr. Holmes told them that it was in the oven. The robbers ordered Mr. and Mrs. Holmes to lie down on the floor and one of the men went behind the bar and opened the oven door. One of the robbers had a rubber mask on which completely covered his

head. The other had a handkerchief over his face and a piece of white cloth on his head. When the man who had gone behind the bar returned the two of them proceeded to tie up Mr. and Mrs. Holmes. There was some talk and one of the men proceeded to drag Mr. Holmes out of the bar area and into a small hallway leading to the restrooms, a distance of approximately 10 yards. The two men then emptied Mrs. Holmes' pocket book and took what money she had. One of the men put his hand on Mrs. Holmes' hip and ran his hand down her leg. She said: "Oh, please don't, I have a baby at home not quite a year old." Hearing his wife Mr. Holmes started to yell and one of the robbers came to him and dragged him back into the bar area beside his wife. Mrs. Holmes stated to the robber who had fondled her that she had four children at home to which one of the men replied: "Do you have a baby sitter with them?" She replied "Yes" and he said "Well, don't worry, nothing will happen," but she kept repeating that she did not want to get hurt because of her children.

The robbers procured some towels and put them underneath their victims' heads. Mr. Holmes thereafter heard some noises, bottles clinking, and later found a glass of coke sitting at the bar. The robbers then left. Mrs. Holmes managed to untie herself first and then untied her husband, who immediately called the owner of the bar and then the police. Mr. Holmes testified that there was $176 in bills and a roll of coins in the bank bag that was located in the oven. Mr. Holmes testified that appellant's hairline, weight and height were similar to those characteristics of the robber.

At about 10:30 or 11 o'clock, the night in question, a Mr. Dean Mapes, who was living in a motel located directly in back of the bar, drove into his carport with his headlights on and saw appellant and Gallegos, a juvenile, standing inside. As he proceeded into his carport the two men walked out of the carport.

Officer James Mason received a call in his radio car shortly after 4 a. m. and proceeded to the bar. After remaining there a short time he drove about a mile down the highway to a parked car which seemed to be abandoned. Some two and a half to three hours later the vehicle was identified as belonging to appellant. About 30 minutes after this identification Mason discovered a bag which had been placed in a hole and partially covered with dirt and leaves. The bag contained two guns, their holsters, and $176.76 in bills and rolled coins. The bag also contained a napkin and a pair of cloth gloves.

Another officer, James Wheatley, received information which led him a couple of miles south of the robbed bar. He saw two men who answered the description of the robbery suspects running up the side of a hill across a ravine. One was Gallegos, the other appellant. The officer identified himself and yelled for the men to halt, which they failed to do. The officer fired from his revolver and Gallegos stopped running and returned to the officer. Appellant continued running over the top of the hill and disappeared. Some time thereafter appellant was taken into custody and had a conversation with Officer Loren Shoemaker at the San Dimas Sheriff's Substation. Two other detectives were present during this conversation. Appellant's statements were made freely and voluntarily. Shoemaker asked appellant why he failed to stop on the hill when told to halt. He said, ''Well, I had too much to lose.'' Appellant also said that he would not sign a statement but then admitted that he and Gallegos had, in fact, committed the robbery at the bar. He said, ''Well, we drove around and decided that was the place that we would hold up. We parked our car and went out back of the bar and stood under the eaves of the building until the bar closed.'' He then proceeded to describe in specific terms the details of the crime. In a second conversation with Officer Shoemaker, with Gallegos present, appellant again admitted committing the crime. He then said that he would like to see the people he had robbed and make an apology. The officer thereupon brought Mr. and Mrs. Holmes into the interview room. Appellant apologized for any inconvenience and then said, ''We didn't harm you in any way, did we. . . . As a matter of fact, we treated you very nice. We even put towels under your heads.'' Appellant then asked Mrs. Holmes if the baby sitter was still at home when she got there and whether the children were all right. Appellant then stated words to the effect that ''we committed the crime and now we have got to take the rap.'' Officer Shoemaker asked appellant which one of them had taken a drink at the bar. Appellant replied: ''I didn't have a drink. I had a coke.''

Defendant testified in his own behalf and denied participation in the actual robbery. He stated that he had gone bowling with Gallegos much earlier in the day, had left the bowling alley about 7 p. m. to eat supper and had returned about two hours later to find Gallegos gone. He testified that he stayed in the bowling alley until approximately 3 a. m. at which time he received a telephone call from Gallegos requesting him to

come to San Dimas and pick him up because he was stranded. Appellant stated that he then drove to San Dimas and met Gallegos at a gas station. He then proceeded to start home but had car trouble after a few miles. The two men attempted to fix the car but were unsuccessful and started out across a field to catch a bus. On their way appellant heard someone say ''Stop'' which he did. At this point Gallegos told him he, Gallegos, had been involved in a holdup. Then the bullets started to fly and appellant ran, but was picked up around midnight, taken to the General Hospital in Los Angeles. He testified that the following morning he was interrogated by Officer Shoemaker. The officer denied this visit to the hospital.

Gallegos, who had pleaded guilty, testified that he had, in fact, committed the robbery, but with a man named James Jamison and a friend named Ernie. He substantiated appellant's story in all material respects.

On cross-examination Gallegos was questioned particularly whether he had made to Officers Shoemaker and Fowler or Deputy Probation Officer John Luymes many statements implicating Burks. To most of the questions he answered that he did not remember; to others he testified that he did not make the statements. He testified that he had stated that the man who assisted him in the robbery was Jamison and that he had not stated that Burks was implicated in the robbery. When the district attorney announced that he proposed to call Officers Fowler and Shoemaker and Probation Officer Luymes for the sole purpose of impeaching the testimony of Gallegos, the court instructed the jury that the testimony to be given was to be received solely for any bearing it might have on the credibility of Gallegos, and was to be considered by the jury for no other purpose.

In rebuttal Officers Shoemaker and Fowler testified that Gallegos admitted committing the crime and said appellant had been his partner in the escapade. In Gallegos' numerous conversations with the officers he at all times named appellant as his partner in the robbery.

John Luymes, a probation officer, testified that he interviewed Gallegos and that Gallegos told him that Burks was the instigator of the robbery; that he and appellant had talked over and planned the job in the bowling alley the previous morning. The testimony in rebuttal was admitted without objection.

Appellant first contends that the evidence is insufficient to sustain his conviction. This argument is without

merit. The testimony of Mr. and Mrs. Holmes was clearly sufficient to establish the corpus delicti of robbery and kidnaping for the purpose of robbery. This, appellant does not deny. Once the corpus delicti was established his extrajudicial admissions could be introduced and form the basis of his conviction. (*People* v. *Treggs,* 171 Cal.App.2d 537, 544 [341 P.2d 342].)

There was ample testimony to establish appellant's identity as one of the participants in the robbery. The detailed admissions made to the officers, which we have noted previously, leaves little doubt that appellant was the perpetrator of the crime. The jury could reasonably have deduced from these admissions and the corroborating evidence of Mr. Mapes that appellant committed the crimes of which he was charged.

This court must assume in favor of the jury's verdict the existence of every fact which the jury could have reasonably deduced from the evidence. (*People* v. *Michaels,* 193 Cal.App.2d 194, 198 [13 Cal.Rptr. 900].)

It was for the jury to determine whether or not they would believe the testimony of appellant or that of the prosecution witnesses. Thus the validity of appellant's admissions was for their exclusive determination. (*People* v. *Morton,* 191 Cal.App.2d 744, 746-747 [12 Cal.Rptr. 817].)

Appellant next assigns as error alleged prejudicial misconduct on the part of the prosecuting attorney. An examination of the record fails to disclose any misconduct. His numerous complaints of misconduct are in two specific areas, first, certain questions asked Gallegos on cross-examination and, second, statements made by the prosecuting attorney in his argument to the jury. "The rule is established that unless the harmful results of misconduct of the district attorney cannot be obviated by appropriate instructions of the trial court, error cannot be predicated in this court on such alleged misconduct in the absence of (a) assignment of such misconduct as error; and (b) a request to the trial court to instruct the jury to disregard it. [Citations.]" (*People* v. *Hampton,* 47 Cal.2d 239, 240-241 [302 P.2d 300].) Since at no time during the course of the trial were those alleged acts of misconduct objected to by appellant he is foreclosed from here claiming error. Upon a review of those instances complained of by appellant we are convinced that under the circumstances the questions and argument were not improper, but that even if they were any prejudice accruing to appel-

lant could have been cured by timely objection and an instruction to the jury to disregard.

Appellant claims the trial court committed prejudicial error in sustaining certain objections made by the prosecuting attorney and in the content of its instructions to the jury. In the first instance appellant alleges that the trial court was in error when it sustained the objection to a question directed to appellant when he was on the witness stand to relate a conversation he had with Officer Shoemaker. The objection was made on the grounds that it called for a self-serving statement and was hearsay. But when appellant's counsel pointed out to the court that he was offering this conversation for the purpose of impeaching the testimony of Shoemaker, the trial court allowed counsel further examination on the point in order to lay a proper foundation and then allowed appellant to testify to the conversation. Since the statements appellant desired to make were received in evidence for the purpose of impeaching Shoemaker, appellant's contention of prejudicial error in this regard is devoid of substance.

Appellant likewise urges error in the sustaining of an objection to a question asked Gallegos regarding his conversation with Shoemaker on the grounds that it called for a hearsay answer. Counsel for appellant made no statement as to the purpose for which the testimony was offered. If, as is reasonable to assume under the circumstances, it was offered to prove the truth of the matter asserted it was clearly inadmissible. (*People* v. *Radley,* 68 Cal.App.2d 607, 609 [157 P.2d 426].) If it was offered by way of impeaching his own witness it was inadmissible for lack of showing sufficient surprise to counsel. (*People* v. *Wilson,* 156 Cal.App.2d 728, 742 [320 P.2d 117].)

As for appellant's contention that the trial court was in error for instructing the jury as to what constituted kidnaping as set out in section 209 of the Penal Code, we can find no support for appellant's contention. The instructions given by the court were proper and sufficient. The instruction based upon sections 207 and 209 which defined the two crimes of kidnaping were requested by appellant. These instructions adequately informed the jury as to the specific intent and asportation elements required under the sections.

Appellant next urges error in that he was twice put in jeopardy for necessarily included offenses. The crux of his argument at this point rests upon the fact that appellant, in the information was charged with but one crime, robbery.

The amended information charged appellant with robbery in Count I and kidnaping in Counts II and III. The fact that he pleaded to the amended information and failed to move to have it set aside in the trial court constitutes a waiver of any alleged impropriety in this regard. (*People* v. *Workman,* 121 Cal.App.2d 533, 535 [263 P.2d 458].) ▮ Further, the crime of robbery and kidnaping for the purpose of robbery are separate and distinct crimes. (*People* v. *O'Farrell,* 161 Cal. App.2d 13, 20 [325 P.2d 1002].)

▮ Finally, appellant argues that he has been subjected to multiple punishment for a single criminal act in violation of the Penal Code, section 654. ▮ The Supreme Court in *Neal* v. *State of California,* 55 Cal.2d 11, 19 [9 Cal. Rptr. 607, 357 P.2d 839], stated the appropriate test as follows: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (Also see *Seiterle* v. *Superior Court,* 57 Cal.2d 397, 399-400 [20 Cal.Rptr. 1, 369 P.2d 697].) ▮ In the instant case while it can be argued that the moving of the victims was in some respects unnecessary for the accomplishment of the robbery, no argument can be effectively advanced that the "intent and objective" of appellant was directed toward any purpose other than the robbery itself. None of the evidence before us indicates another objective. The moving of Mr. and Mrs. Holmes back into the bar and their further removal from one place to another inside the bar were incidental to the robbery. (See *People* v. *Kennedy,* 101 Cal.App.2d 709 [226 P.2d 359].) In *People* v. *Knowles,* 35 Cal.2d 175, 187 [217 P.2d 1], the factual situation was similar in many respects to the instant case. In that case, as here, the defendants kidnaped two persons for the purpose of robbing them. The robbery convictions were reversed by reason of Penal Code, section 654, but both kidnaping convictions were affirmed.

The robbery conviction is reversed. The kidnaping convictions are affirmed.

Ford, J., and Files, J., concurred.

A petition for a rehearing was denied July 6, 1962, and appellant's petition for a hearing by the Supreme Court was denied August 6, 1962.