[Crim. Nos. 9229, 9298. In Bank. July 25, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM J. FORD, Defendant and Appellant.

[Two Cases.]

44

Eric A. Rose, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

PETERS, J.—This is the second appeal in this case. The first trial resulted in a first degree murder verdict, and the jury fixed the penalty as death. That judgment was reversed because of errors in the instructions. (*People* v. *Ford*, 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892].) The murder charge was retried and again the jury found the defendant guilty and imposed the death penalty. The appeal from this judgment is automatic. (Pen. Code, § 1239, subd. (b).) Defendant also appeals from judgments sentencing him as a result of certain felony convictions obtained at the first trial which were affirmed on the previous appeal.

Defendant in a multicount information was charged in count 1 with the burglary of the home of John B. Roope on June 2, 1961. In the remaining counts, all referring to events occurring on June 9, 1961, defendant was charged with possessing a concealable weapon in violation of Penal Code section

12021 (count 2), robbing Roope of $29 (count 3), kidnaping Roope (count 4), assaulting Ben Hardy with a dangerous weapon (count 5), kidnaping defendant's wife, Emma Ford (count 6), and murdering David Harvey Stahl (count 7). Defendant pleaded not guilty to all counts. Pleas of not guilty by reason of insanity were withdrawn when the cause was submitted to the jury on the not guilty pleas. On the first trial the jury convicted defendant on each count, finding the burglary, the robbery, and the murder to be of the first degree. By stipulation the question of penalty was submitted to the jury on the evidence received at the murder trial. The jury fixed the penalty at death, and defendant's motion for a new trial or for reduction of the penalty was denied.

In a unanimous opinion written by Justice Schauer, we affirmed the judgments of conviction on all of the non-homicide counts, except the burglary count, as to which the judgment was modified. We reversed the judgment on the murder count, however, and remanded the cause for a new trial. The grounds for reversal were that the trial court erred in giving improper instructions on intoxication and in failing to give of its own motion the required cautionary instruction as to defendant's alleged oral admission. These errors were held to have been prejudicial. Except for the testimony of defendant, he not having testified at the retrial, and the evidence on premeditation, the essential facts are set forth in our former opinion and need not be repeated here. (*People* v. *Ford, supra,* 60 Cal.2d 772.)

On March 18, 1964, after the remittitur on the previous appeal was filed, the matter came on regularly for arraignment and sentence of defendant on counts 1 through 6 and for setting of a trial date on count 7 in accordance with the remittitur. Defendant appeared without counsel. In accordance with defendant's wishes, John Seitz, who had been defense counsel at the first trial, was appointed in an advisory capacity for the arraignment. A motion for a continuance to March 30, 1964, was granted for the purpose of determining whether Attorney Seitz would accept appointment as defense counsel at the new trial. Defendant waived time for sentencing and announced that at a time previous to the rearraignment he wished to object to the jurisdiction of the court to rearraign him. Defendant requested and the court ordered that a hearing on that objection be set for March 25, 1964. After several continuances new counsel were appointed to represent defendant at retrial, and the judge who presided at the first trial disquali-

fied himself from retrying the case. Further continuances were granted on motions by defendant.

On July 31, 1964, the superior court vacated and set aside the finding of the jury with respect to burglary of the first degree in count 1, and pursuant to the remittitur found the offense to be of the second degree, and modified the judgment as ordered in our decision. (*People* v. *Ford, supra,* 60 Cal.2d 772, at pp. 801-802.)

On August 21, 1964, defendant was arraigned on the information as to the murder charge, and pleaded not guilty, not guilty by reason of insanity, and former jeopardy. Execution of the sentences on the nonhomicide counts was stayed.

Two grounds are presented as the basis for defendant's appeal from the judgment entered as a result of our affirmance of the nonhomicide counts on the previous appeal.

Defendant first complains that he was improperly sentenced on the nonhomicide counts because sentence was not pronounced within the time limit set in Penal Code section 1191,[1] and that he is therefore entitled to a new trial on those counts as provided in Penal Code section 1202.[2]

When the cause was called in the superior court for arraignment for sentencing defendant moved for a continuance, stating that before arraignment he wished to object to the jurisdiction of the court. Defendant waived the 60-day time limit for trial, but waiver of time to be sentenced was not mentioned. Before the 60 days expired, however, defendant

---

[1]The relevant portion of Penal Code section 1191 provides as follows:

"In the superior court, after a plea, finding or verdict of guilty, or after a finding or verdict against the defendant on a plea of a former conviction or acquittal, or once in jeopardy, the court must appoint a time for pronouncing judgment, which must be within 21 days after the verdict, finding or plea of guilty, during which time the court shall refer the case to the probation officer for a report if eligible to probation and pursuant to Section 1203 of this code; provided, however, that the court may extend the time not more than 10 days for the purpose of hearing or determining any motion for a new trial, or in arrest of judgment, and may further extend the time until the probation officer's report is received and until any proceedings for granting or denying probation have been disposed of."

[2]Penal Code section 1202 provides as follows:

"If no sufficient cause is alleged or appears to the court at the time fixed for pronouncing judgment, as provided in Section 1191 of this code, why judgment should not be pronounced, it must thereupon be rendered; and if not rendered or pronounced within the time so fixed or to which it is continued under the provisions of Section 1191 of this code, then the defendant shall be entitled to a new trial. If the court shall refuse to hear a defendant's motion for a new trial or when made shall neglect to determine such motion before pronouncing judgment, or the making of an order granting probation, then the defendant shall be entitled to a new trial."

moved to have the hearing on his objection continued. This motion was granted. Subsequently, on April 20, 1964, defendant moved for a three-week continuance and waived time as to *all* matters.

█ A defendant cannot complain that he was not sentenced within the time period prescribed by section 1191 of the Penal Code where he waives time for or sanctions the postponement of his sentencing. (*People* v. *Daly*, 168 Cal.App.2d 169, 173, 174 [335 P.2d 503].) In the instant case defendant expressly waived time to be sentenced and cannot now be heard to complain that he was sentenced beyond the 21-day period set forth in section 1191.

█ Further, as stated in *People* v. *Williams*, 24 Cal.2d 848, 850 [151 P.2d 244], "Although section 1191 provides that the judgment must be pronounced within a designated period, it has been consistently held that failure to pronounce judgment within the time specified is not jurisdictional. . . . [and] 'does not automatically entitle the defendant to a new trial under the provisions of section 1202 of the Penal Code, nor does such delay render the judgment void for lack of jurisdiction. A judgment so pronounced may not be reversed on appeal unless the delay results in a miscarriage of justice. . . .' " There was here no such miscarriage of justice.

On August 21, 1964, after several continuances, the trial court pronounced judgment and sentenced defendant on the felony convictions obtained at the first trial in conformity with our earlier ruling. (*People* v. *Ford, supra,* 60 Cal.2d 772, at pp. 801-802.) Defendant was separately sentenced to state prison for the term prescribed by law for each of the nonhomicide felonies of which he stood convicted, the sentences to run concurrently.

Defendant asserts that the sentences constitute double punishment in violation of Penal Code section 654.[3] He argues that he cannot be punished for both the kidnaping and robbery of Roope because they were part of a continuous and nondivisible transaction.

The robbery of which defendant was convicted took place on the morning of June 9, 1961. At that time defendant entered the house of John Roope located near Atascadero and, with a pistol which he had burglarized from Roope's house on an

---

[3]Penal Code section 654 provides in relevant part as follows:

"An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

earlier occasion, forced Roope to give him $25 and some additional shells for the pistol. Defendant, who did not have an automobile, thereupon compelled Roope to drive him to Creston. When they arrived in Creston defendant kidnaped his wife, who was there living with another man, and committed an assault with a dangerous weapon upon Ben Hardy. Defendant took the wheel of Roope's car when he departed from Creston with his wife and children; Roope, however, was forced to accompany the group. A few hours later, after defendant drove about the countryside without aim or purpose and otherwise acted irrationally, defendant shot Deputy Sheriff David Harvey Stahl after the latter, who knew of the assault in Creston, stopped defendant and asked him to hand over his gun.

Whether defendant's course of criminal conduct in robbing and kidnaping Roope is divisible and therefore gives rise to more than one act within the meaning of section 654 depends upon his intent and the determination whether he committed both offenses incident to one objective. (*Neal* v. *State of California*, 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Jaramillo*, 208 Cal.App.2d 620, 628 [25 Cal.Rptr. 403].)

The case of *In re Chapman*, 43 Cal.2d 385 [273 P.2d 817], presents a factual situation approximating the facts in the instant case with respect to the question of divisible acts. In *Chapman* the defendant committed a robbery while armed with a deadly weapon with which he menaced the victim and obtained from him a sum of money through thus placing him in fear; after the victim had produced the money, he attempted to escape. Defendant's accomplice tackled him and the defendant then assaulted him with the weapon. It was held that the assault was not a means of perpetrating the robbery but a separate act that followed after the robbery was completed, and that therefore the defendant was guilty of two punishable acts.[4] ██ Similarly, in the case now before us the kidnaping was not a means of perpetrating the robbery and was also preceded in time by the robbery. On this theory the trial court did not violate the proscription of section 654 against multiple punishment of a single act because the rob-

---

[4]Compare *People* v. *Logan*, 41 Cal.2d 279 [260 P.2d 20], and *People* v. *Allen*, 220 Cal.App.2d 796 [34 Cal.Rptr. 106], in which, for the purpose of committing robberies, assaults were committed first, and it was held that under section 654 the defendants could not be punished for both the assault and the robbery.

bery and kidnaping convictions were predicated upon separate acts.

The instant case is conspicuously different in one crucial respect from the cases in which appellants have successfully raised the issue of double punishment based upon multiple convictions involving robbery and kidnaping. (See, e.g., *In re Ward,* 64 Cal.2d 672, 675-676 [51 Cal.Rptr. 272, 414 P.2d 400]; *People* v. *Carter,* 56 Cal.2d 549, 565 [15 Cal.Rptr. 645, 364 P.2d 477]; *People* v. *Wein,* 50 Cal.2d 383, 409-410 [326 P.2d 457]; *People* v. *Knowles,* 35 Cal.2d 175, 186 [217 P.2d 1], cert. den. 340 U.S. 879 [71 S.Ct. 117, 95 L.Ed. 639]; *People* v. *Alvarado,* 231 Cal.App.2d 789, 794 [42 Cal.Rptr. 310]; *People* v. *Morrison,* 228 Cal.App.2d 707, 715 [39 Cal. Rptr. 874]; *Adams* v. *Heinze,* 205 Cal.App.2d 53, 55 [22 Cal.Rptr. 814]; *People* v. *Burks,* 204 Cal.App.2d 494, 503 [22 Cal.Rptr. 414]; *People* v. *Velarde,* 201 Cal.App.2d 231, 233-234 [19 Cal.Rptr. 832]; *People* v. *Kennedy,* 101 Cal.App.2d 709, 715 [226 P.2d 359].) In those cases, unlike the present case, the defendant was charged with both kidnaping for the purpose of robbery (Pen. Code, § 209) and robbery, and in each case the kidnaping preceded and was the means of accomplishing the robbery. (See *People* v. *Brown,* 29 Cal.2d 555, 558 [176 P.2d 929].) The offense of robbery, of course, is necessarily included within the offense of kidnaping for the purpose of robbery where the kidnaper achieves his purpose. In the present case, as we have seen, the robbery which occurred at Roope's house was completed *before* defendant commenced the acts relied upon as establishing the kidnaping; and neither robbery nor simple kidnaping (Pen. Code, § 207), the crimes with which defendant was charged and convicted, is an offense necessarily included within the other.

From the record it appears that a subsequent taking of money from Roope during the trip in order to purchase liquor, cigarettes and fuel for the automobile, was merely an afterthought on the part of defendant,[5] and was unrelated to the kidnaping. This conclusion is strengthened by the fact, previously adverted to, that the prosecuting authorities did not at any time see fit to charge defendant with kidnaping for the purpose of robbery.

---

[5]See *In re Ward, supra,* 64 Cal.2d 672, 678, where it was held that since the petitioner did not formulate the intent to rape his victim until after he had robbed her, the offense of rape was separately punishable. See also *Seiterle* v. *Superior Court,* 57 Cal.2d 397, 401 [20 Cal.Rptr. 1, 369 P.2d 697].

We now turn to the appeal from the conviction of murder at the second trial. Defendant first argues that since he was not arraigned on a theory of felony-murder it was error to submit instructions on that issue to the jury. He further claims that the instructions were improper because they told the jury that he had been convicted of robbery, kidnaping and possession of a concealable weapon by an ex-felon, and reserved for the jury only the questions whether the homicide was perpetrated during the commission of any or all of these felonies, and whether he possessed the intent requisite to the various felonies at the time of the commission of the homicide.

█ It has long been settled that, in view of our simplified method of pleading in criminal cases, a jury may be instructed on felony-murder theories where the information charges murder with premeditation and malice aforethought. (*People* v. *Witt*, 170 Cal. 104, 107-108 [148 P. 928].)

It is obvious that the felony convictions obtained at the first trial substantially affected the prosecution and defense upon retrial of the murder charge. The burden upon the prosecution was lessened to the extent that it was permitted the benefit of the felony-murder rule without the necessity of having to prove the elements of the respective felonies. Nor was the defense permitted to dispute the fact that the necessary elements of the felonies had been conclusively found. These facts do not, however, compel the conclusion urged upon us by defendant.

█ The doctrine of res judicata applies to criminal as well as civil proceedings and operates to conclude those matters in issue which the verdict determined though the offenses be different. (*Sealfon* v. *United States*, 332 U.S. 575, 578 [68 S.Ct. 237, 92 L.Ed. 180] ; see *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.*, 58 Cal.2d 601, 606 [25 Cal.Rptr. 559, 375 P.2d 439].) █ Thus where a defendant is tried on multiple counts of a single information, each count being considered as a separate and distinct offense, the doctrine of res judicata operates to preclude the relitigation of issues finally determined upon retrial of only one count. (See *People* v. *Beltran*, 94 Cal.App.2d 197, 205 [210 P.2d 238], and cases cited and discussed therein.) █ It follows that the doctrine of res judicata justifies instructions, where relevant, that a defendant has been found guilty of crimes finally adjudicated which are charged as elements in another charge or charges then in the process of being retried. Accordingly, it was not error for the trial court to give appropriate instructions that defendant

had been convicted of the various felonies, and that if they found that defendant's commission of such felonies was conjoined with his commission of the homicide, they might predicate their verdict on the felony-murder rule articulated in Penal Code section 189.

The next problem presented is the sufficiency of the evidence to support the jury's finding of first degree murder. The determination of the degree of the crime is, of course, generally left to the discretion of the jury. ■■■ Upon appeal, the reviewing court is bound to view the evidence most favorably in support of its judgment. (*People* v. *Simpson,* 43 Cal.2d 553, 571 [275 P.2d 31].) But the jury's discretion is not absolute. (*People* v. *Tubby,* 34 Cal.2d 72, 76 [207 P.2d 51].) Recently, in *People* v. *Hall,* 62 Cal.2d 104, 110 [41 Cal.Rptr. 284, 396 P.2d 700], we reaffirmed the principle first stated in *People* v. *Holt,* 25 Cal.2d 59, 70 [153 P.2d 21], that ''Implicit in our duty to determine the legal sufficiency of evidence to sustain a verdict is our obligation, in a proper case, to appraise the sufficiency and effect of admitted or otherwise indubitably established facts as precluding or overcoming, as a matter of law, inconsistent inferences sought to be derived from weak and inconclusive sources.'' (See also Jaffe, *Judicial Review: Question of Fact,* 69 Harv.L.Rev. 1020, 1026-1031.) ■■■ Since the amendment of Penal Code section 1181 in 1927, this court is empowered to modify the judgment and fix a lesser degree of the crime in those instances where on an appraisal of all the evidence there is found to be lacking any substantial evidence of the elements required to constitute the degree of the crime as fixed by the jury. (*People* v. *Tubby, supra,* 34 Cal.2d 72, 76, and cases cited therein.) ■■■ As was recently stated in *People* v. *Wolff,* 61 Cal.2d 795, at page 819 [40 Cal.Rptr. 271, 394 P.2d 959], ''when a proper case appears (Pen. Code, § 1181, subd. 6) we do not hesitate to modify the judgment to murder of the second degree and affirm it as modified.''

■■■ Except for the requisite mental capacity on the part of defendant, it is clear that the murder of the deputy sheriff would be of the first degree. By evidence introduced on retrial, however, we are precluded from making such an assumption. The record compels the conclusion that, at the time of the homicide, defendant was unable to, and did not premeditate his acts.

As already indicated, defendant did not testify in his own behalf. Through extensive testimony by three psychiatrists the

defense attempted to establish that at the times surrounding the homicide defendant did not possess the mental ability to commit first degree murder, due to emotional disturbance, intoxication and malnourishment.

It was established through the testimony of a laboratory technician and a physician that at 5 p.m. on June 9, 1961, defendant's blood contained 1.7 milligrams of alcohol per milliliter of blood, and that at the time the homicide was committed, about 1 p.m. the same day, defendant's blood alcohol content was approximately 2.3.

Dr. John L. Carleton, a psychiatrist who was appointed by the court at the first trial, was the principal defense witness at the second trial. He testified that he examined defendant on two occasions, July 29 and August 8, 1961. Each examination lasted about two and a half hours. Dr. Carleton had electroencephalograms performed on defendant while he was awake, while he was asleep and while he was under the influence of alcohol. He also read reports by a physician who did a neurological examination of defendant.

The witness first described the history which he had elicited from defendant. Defendant was born in Kentucky, a member of a rather large family. His father drank excessively, was very unstable and was fond of imposing physical punishment. He punished defendant on many occasions. The family was poor and defendant did not have adequate clothing. On a number of occasions he hit himself on the nose in order to be able to stay home from school and avoid ridicule because of his clothing. When defendant was 13 his father was accused of having sexual relations with one of his daughters. Defendant and one of his sisters were removed from the family and placed in an orphanage. This was done precipitously, and the family was unaware of defendant's whereabouts for about a week after they were removed from the house. Defendant lived in the orphanage until he was 17 or 18, making a poor adjustment there. He returned to live with his family but did not remain there long. He moved to another state and worked there for an older married couple; he married the couple's daughter, who had a bad reputation and was hard of hearing, because he felt sorry for her. They had a number of children during their stormy marriage. On one occasion, while he was in jail on a charge of forging a check, his wife filed for divorce. This so upset him emotionally that he sought the advice of a prison psychiatrist.

Defendant served in the Philippines during World War II, and compiled a satisfactory record during this military

service. After his discharge, however, he had difficulty with law and society. He forged checks and was sent to jail on several occasions,[6] once for almost a year. Defendant had a drinking problem, drinking sporadically rather than continuously. Dr. Carleton testified that defendant became aggressive when under the influence of alcohol.

According to Dr. Carleton, who apparently relied on the preliminary transcript for some of his facts, defendant was hiding from the police because of having heard of a warrant out for his arrest for forging checks. Not long before the day the alleged crimes occurred, he took his son, Billy, and went into the national forest area where they spent a week or more out in the woods. Toward the end of this time defendant told Billy to return to his mother who was then living with another man. Defendant was alone in the forest for the week or 10 days immediately prior to the day of the homicide. During this time he experienced periods of intense loneliness and, toward the end, severe malnourishment, which Dr. Carleton believed disorganized his thinking. Near the end of the period he found and ate some deer entrails which made him sick.

· Defendants also told Dr. Carleton that on the morning of the shooting he slept in an outhouse and drank a bottle of wine under a bridge. Early in the morning, when he was under the bridge, he tried to figure out how he could get his family back together. He decided to collect all members of the family and take them to Illinois. He believed that he needed a gun for protection because Ole Atkins, the man with whom his wife was staying in Creston, had on a previous occasion shot over his head and told him that the next time defendant bothered him he would shoot to kill.

Defendant told the psychiatrist that he recalled seeing his wife come toward him after he arrived at Atkins' house, but remembered nothing until he woke up the next day in jail and was told that he had shot and wounded Ben Hardy and killed a deputy sheriff. Dr. Carleton concluded that this claimed lack of memory was not faked. He testified that the alcohol defendant had taken, the influence of which was exacerbated by the malnourishment, affected his ability to distinguish, premeditate, think and compute. The doctor stated that from his examination he believed that there was a marked diminution

---

[6]These prior convictions, which were obtained in Illinois, were the basis of the second count of the information at the first trial, charging possession of a concealable weapon by an ex-felon. (Pen. Code, § 12021.) So far as appears, defendant has never previously been convicted of a crime of violence.

of defendant's capacity to carry out the mental and thinking functions necessary to appreciate or understand the nature of his acts, to deliberate, to consider facts, to weigh decisions and actions, or to be morally concerned with others. It was Dr. Carleton's opinion that defendant "was not able to deliberate or premeditate his acts" at the time of the shooting.

On cross-examination Dr. Carleton testified that "unconsciousness" was, in the physical sense, a state of sleep, a comatose state, or a state of immobility. He testified that defendant was not unconscious in that sense; that he was aware to the extent that he was able to perceive with his passive senses; that he could interpret this information in a primitive way, being governed only by underlying emotional motivation. He stated that when defendant saw the two highway patrol cars, his brain received the visual message, but the brain merely interpreted danger and need for escape in order to accomplish his prime emotional goal of reuniting his family. His interpretation of his perceptions was controlled by his particular mental status at that time. Dr. Carleton testified that while, at the time of the homicide, defendant was not unconscious in the medical or physical sense because he was responding to his memory, he was unconscious of the realities of the situation and the realities were not exerting any influence upon him.

On redirect examination the witness testified that defendant's mental condition was due to psychological and physical causes, specifically, psychological stress of long duration, poor capacities of mind, and emotion and alcohol. As the stress mounted, his actions became more and more automatic.

Two other psychiatrists, Dr. James Wells, who was also appointed by the court at the time of first trial, and Dr. Eric Marcus, testified at some length and supported Dr. Carleton's testimony in all relevant respects. Both doctors testified that defendant was semiconscious or acting automatically at the time of the shooting[7] and was then unable to deliberate or premeditate his acts.

 It has long been settled under the *Wells-Gorshen* rule of diminished capacity that in cases other than those where a felony-murder is charged, a defendant cannot be convicted of murder of the first degree if, at the time of the alleged offense, he was operating under a mental disability not amounting to legal insanity that prevented him from acting with malice

---

[7]Dr. Marcus denominated defendant's condition as "post-alcoholic amnesia."

aforethought or with premeditation and deliberation. (*People* v. *Conley,* 64 Cal.2d 310, 316-318 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Henderson,* 60 Cal.2d 482, 490-491 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Baker,* 42 Cal.2d 550, 569-571 [268 P.2d 705]; *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53].)

▆▆▆ We need only point out that in the instant case the testimony of the three psychiatrists that defendant was in a semiconscious or unconscious state when he shot the deputy sheriff and was not then able to deliberate or premeditate was not contradicted by any other evidence introduced by the prosecution. The prosecution presented no psychiatric testimony to rebut the evidence introduced by the defense.[8] Without any such evidence to the contrary, we are unable to find that defendant could have formed or sustained the premeditation requisite to a conviction of willful, deliberate and premeditated murder, which is murder of the first degree (Pen. Code, § 189) punishable by death (Pen. Code, § 190).

▆▆▆ Nor can we uphold the conviction of first degree murder on the basis of the felony-murder rule. (Pen. Code, § 189; see also *People* v. *Washington,* 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Ford, supra,* 60 Cal.2d 772, 795; *People* v. *Coefield,* 37 Cal.2d 865, 868 [236 P.2d 570].) Robbery was the only felony committed by defendant

---

[8]The prosecution's evidence on this question at the first trial was summarized by Justice Schauer as follows:

"'The prosecution's principal rebuttal witness was Dr. Donald S. Patterson, a psychiatrist, who testified that in his opinion defendant's amnesia was faked and that defendant was a sociopath who had the ability to deliberate and premeditate at the time of the homicide. It appeared, however, that this witness examined defendant two days after the shootings (by which time defendant was no longer drunk) and at that time did not have the benefit of Dr. Carleton's computations (or the basis for them) as to the high concentration of alcohol in defendant's blood at the times here material. When presented these figures on cross-examination the witness qualified his direct testimony by saying that in such circumstances defendant 'might still be able to calculate, [but] I don't know about coldly calculate.' Dr. Patterson conceded, moreover, that an individual with defendant's personality structure 'would be likely to' react more violently to a high alcoholic blood level, and that 'The effect of alcohol on this type of person with or without the food would be even further—be more difficult for him in the sense of his control. In other words, his impulses would be stronger, he would feel more impulsively in his feelings.'"' (*People* v. *Ford, supra,* 60 Cal.2d 772, 790.)

This evidence of premeditation and deliberation, although weak, was deemed by Justice Schauer to preclude reduction of the crime to second degree murder on the first appeal. (60 Cal.2d at p. 795, fn. 11.) We note that at the second trial, which is the basis of the instant appeal, the prosecution did not present Dr. Patterson as a witness, nor did it present any expert psychiatric testimony whatsoever.

which is enumerated in section 189, and which could therefore sustain a verdict of first degree murder under the felony-murder rule if found by the jury to still have been in the process of being perpetrated at the time of the homicide. We do not know from their verdict whether the jury's finding of first degree murder was posited on this theory or upon premeditation and intent.

The question whether the robbery was still in process at the time of the shooting should not have been reserved to the jury. Rather the trial court should have determined, as a matter of law, that the robbery terminated prior to the homicide.

As pointed out in our discussion of the nonapplicability of section 654 proscribing double punishment, the robbery and the kidnaping were divisible acts not part of a continuous transaction and it was not error to punish defendant separately for each offense. We based that conclusion upon the findings, set forth above, that the robbery was complete prior to the inception of the acts constituting the kidnaping and was unrelated to the kidnaping. Together with other facts to be emphasized below, these findings also compel the conclusion that defendant could not have been convicted of first degree murder on a theory of robbery-murder.

We are mindful of the fact that robbery is a continuing crime, and we are cognizant of the oft-quoted statement of this court ''that where two or more persons engage in a conspiracy to commit robbery and an officer or citizen is murdered while in *immediate pursuit* of one of their number who is fleeing from the scene of the crime with the fruits thereof in his possession, or in the possession of a co-conspirator, the crime is not complete in the purview of the law, *inasmuch as said conspirators have not won their way even momentarily to a place of temporary safety and the possession of the plunder is nothing more than a scrambling possession.*'' (Italics added.) (*People* v. *Boss,* 210 Cal. 245, 250-251 [290 P. 881] ; see also *People* v. *Ketchel,* 59 Cal.2d 503, 523-524 [30 Cal.Rptr. 538, 381 P.2d 394].)

In the present case, however, many hours elapsed between the time of the robbery and the shooting of Officer Stahl. Unlike *People* v. *Rye,* 33 Cal.2d 688 [203 P.2d 748], there was here no direct evidence that defendant was endeavoring to escape the robbery when he shot the deputy ; on the contrary, there is strong evidence that he was not. Officer Stahl's pursuit of defendant was not in relation to defendant's earlier commission of the robbery ; there was no showing at trial that

the police even knew of the robbery until after defendant had been apprehended. Additionally, it should be pointed out that defendant had the opportunity to and did spend some of his loot prior to the shooting; that during the period of approximately four hours between the robbery of Roope's house and the killing he drove aimlessly over a great distance; and that, with respect at least to the robbery, he had won his way to places of temporary safety before he committed the homicide. Considering the facts as a whole, it must be held that the robbery and escape therefrom did not motivate defendant's subsequent conduct, but were merely incidental to his primary objectives. Thus, it cannot be held that the homicide can be promoted to murder of the first degree on the theory that the homicide was committed in the perpetration of a robbery. On the basis of the record, it must be held as a matter of law that the killing of Officer Stahl cannot be deemed to have been committed during the course of the robbery.

The offenses of kidnaping (Pen. Code, § 207) and possession of a concealable weapon by an ex-felon (Pen. Code, § 12021), of which defendant was also convicted, are distinct from the robbery offense. These offenses are by their nature continuing crimes, and were unquestionably still in the process of being committed by defendant when the killing occurred. But, while they are felonies, these offenses are not enumerated in Penal Code section 189, and will not, therefore, support a conviction of murder in the first degree on the basis of the felony-murder rule, although they do sustain a conviction of murder in the second degree. Thus, while we conclude that the judgment of murder of the first degree is unsupported by facts in the record and must therefore be modified, the evidence establishes the homicide as murder of the second degree due to the operation of the felony-second-degree-murder rule.

Defendant makes various other arguments for reversal. These arguments are all without substantial merit or without support in the record.

Defendant maintains that it was error to refuse requested manslaughter instructions because evidence of diminished capacity to form the mental states necessary for murder was introduced. This argument was discussed and dismissed by Justice Schauer when this case was first before us. At that time we held that the homicide was, as a matter of law, at least murder in the second degree. (*People* v. *Ford, supra,* 60 Cal.2d 772, at p. 795.) As Justice Schauer pointed out, a homicide that is a direct causal result of the commission of a

felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes second degree murder. (60 Cal.2d at p. 795.) In our decision in *People* v. *Conley, supra,* 64 Cal.2d 310, which was rendered after Justice Schauer's opinion in the earlier appeal, we held that it was prejudicial error to refuse to instruct on manslaughter in a homicide case where evidence of diminished mental capacity and intoxication was introduced by the defense. The rule that was announced in *Conley,* however, is inapplicable to the facts in the present case. As noted in *Conley,* manslaughter instructions may not be necessary in a case in which diminished capacity and intoxication are relied on by the defense if the felony-murder rule is involved. (*People* v. *Conley, supra,* at p. 324, fn. 4.) Thus, *Conley* does not alter the rule, articulated by Justice Schauer on the previous appeal, that a homicide found to have been perpetrated during the commission of certain felonies cannot be less than murder of the second degree. (See *People* v. *Dorman,* 28 Cal.2d 846, 853 [172 P.2d 686].) In the words of Justice Schauer, ''The evidence other than that related to the murder count amply supports the judgments of conviction of the felonies of kidnaping Roope and Mrs. Ford (Pen. Code, § 207) and of possession of a concealable weapon by an ex-felon (Pen. Code, § 12021, here determined to be a felony as defendant was sentenced therefor to state prison for the term provided by law). ▮ These latter crimes are by their nature continuing ones, and were still in the process of being committed when the killing of Officer Stahl took place. They are inherently dangerous to human life, and 'the killing had a direct causal relationship to the crime[s] being committed' (*People* v. *Robillard* (1960) 55 Cal.2d 88, 98 [9] [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]). It follows that under the rule just stated the homicide in the case at bench was, as a matter of law, at least murder in the second degree. (*People* v. *Carter* (1961) *supra,* 56 Cal.2d 549, [7b] [15 Cal.Rptr. 645, 364 P.2d 477] [kidnaping] ; *People* v. *Robillard* (1960) *supra,* 55 Cal.2d 88, 98 [9] [violation of Pen. Code, § 12021].) '' (*People* v. *Ford, supra,* at p. 795.) It was therefore not error for the trial court to refuse to instruct on manslaughter.[9]

---

[9]Of course, pursuant to the *Conley* rule, manslaughter instructions must be given notwithstanding the involvement of the felony-murder rule in those cases where there is any factual dispute as to whether the homicide was committed during the perpetration of a relevant felony or where the issue of diminished capacity or intoxication is raised as a defense to the felony charge as well as to the murder charge.

Upon the facts as established in the record and upon the law, and for the reasons set forth above, we conclude that the uncontradicted evidence of defendant's mental disability at the time he committed the homicide is inconsistent with the finding that the murder was of the first degree. We conclude also that the evidence adequately supports a conviction of murder in the second degree.

The judgment imposing the death penalty is therefore modified by reducing the degree of the crime to murder of the second degree and, as so modified, is affirmed. The judgment imposing sentence on the nonhomicide counts is affirmed. The cause is remanded to the trial court with directions to arraign and pronounce judgment on defendant on the homicide count in accordance with the rules stated in this opinion.

Traynor, C. J., Tobriner, J., Peek, J., Burke, J., and White, J.,* concurred.

McCOMB, J.—I dissent from the portion of the opinion reducing the degree of the crime of murder to second degree. I would affirm the judgments of the superior court in their entirety.

The petitions of the appellant and the respondent for a rehearing were denied August 24, 1966. White, J.,* sat in place of Mosk, J., who deemed himself disqualified. McComb, J., was of the opinion that the petition should be granted.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.